# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 26, 2000 Session

## STATE OF TENNESSEE v. ANTHONY LYNN WYRICK

### Appeal from the Criminal Court for Knox County
### No. 64317     Ray L. Jenkins, Judge

### No. E1999-02206-CCA-R3-CD
### May 4, 2001

The defendant was convicted of two counts of aggravated rape and sentenced to concurrent terms of life without parole as a repeat violent offender. He challenges the sufficiency of the presentment, the sufficiency of the evidence, the admission of the victim's in-court identification of him as the attacker, the exclusion of evidence of a prior false accusation of rape by the victim, his inability to discover the victim's rape crisis center file, and the constitutionality of the repeat violent offender statute under which he was sentenced. Because the defendant should have been allowed to impeach the victim by cross-examining her about the prior false accusation of rape, we reverse the judgments of conviction and remand the case for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed; Case Remanded

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Laura Rule, Knoxville, Tennessee, attorney for the appellant, Anthony Lynn Wyrick.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Anthony Lynn Wyrick, appeals as of right his convictions in the Knox County Criminal Court for two counts of aggravated rape, a Class A felony. Because the defendant was a repeat violent offender, the trial court sentenced him to concurrent sentences of life without the possibility of parole. See Tenn. Code Ann. § 40-35-120. The defendant contends the following:

(1) the presentment is insufficient because it fails to allege his 1987 rape conviction, which is an essential element of the offenses and should be left for the jury's determination;

(2) the evidence is insufficient to support his convictions because the victim's testimony is uncorroborated and contradictory;

(3) the trial court should have suppressed the victim's in-court identification of him after she admitted that she was not sure that he was the person who raped her;

(4) the victim's prior false accusation of rape was admissible to impeach her credibility;

(5) extrinsic evidence of prior inconsistent statements was admissible to impeach the victim and her family members;

(6) he was denied exculpatory evidence because, in reviewing the victim's rape crisis center file in camera, the trial court did not compare the file to the victim's statements to determine if inconsistencies existed; and

(7) the repeat violent offender statute is unconstitutional.

Because the trial court committed harmful error in not allowing the defendant to cross-examine the victim on the prior false accusation of rape, we reverse the judgments of conviction and remand the case for a new trial.

The charges of aggravated rape against the defendant arose out of LaShonta Harrison's report that he forced her at knife-point to perform oral sex and to submit to vaginal intercourse on July 26, 1997. The then twenty-three-year-old victim testified that at the time of the offenses, she had been married to John David Harrison for two months and that they lived at 2307 East Glenwood Avenue in East Knoxville. She said that her husband worked at BW3, a restaurant in the Old City, and that she worked at Labor World, a temporary employment service. She said that on an assignment from Labor World, she worked at the Knoxville Civic Coliseum from 4:00 to 9:00 a.m. on July 26th. She said she returned to the Coliseum at 3:00 p.m. on the 26th, but she did not remember when she finished. She said that she spoke with her husband several times that evening and that she called him from the pay telephone at Labor World between 12:00 and 1:00 a.m. She said that earlier that evening, she had seen her husband at BW3 and had asked him to meet her at Labor World to walk her home. She said that she was not feeling well that evening and that she waited for about forty-five minutes before she began walking home alone. She said that it usually took twenty-five minutes to walk home.

The victim testified that from Labor World, which was on the corner of Fifth Avenue and Gay Street, she began walking down Fifth Avenue. She said that a car traveling very slowly passed

her a couple of times. She said that she saw the car a third time and that the defendant, who was driving, stopped the car and asked her if she wanted a ride. She said that she did not respond and continued walking on Fifth Avenue. She stated that ten to fifteen minutes later before she turned onto Polk Street, the car passed her again. She said that once on Polk, she saw the car driving toward Washington Street. She said that she became scared and that when the car slowed, she ran, jumped a fence, and ran through someone's yard to get to Washington Street.

The victim testified that she encountered the car again and that the defendant got out with a knife in his left hand and ordered her into the car, telling her that if she did as he directed, nothing would happen to her. She said that she complied because she thought that he would kill her if she refused. She said that the defendant put her in the passenger's side of the car and that she did not run as he walked to the driver's side because she thought that he would be faster than she was. She said that the defendant demanded oral sex while driving and pulled down his shorts, exposing his penis. She said that she complied because he told her that if she performed oral sex, she would not be hurt. She said that she performed oral sex for less than a minute while the defendant held her neck with one hand, held the knife, and drove. She said that she stopped and tried to open the car door, but the defendant ordered her to lock it. She stated that after she refused to continue performing oral sex, he stopped the car, got out, pulled her shorts down, and penetrated her vagina with his penis. She said that he ejaculated on the passenger's seat. She said that he then told her to get out of the car and that as he drove away, she saw that the car had a Tennessee handicapped license tag, number UDA-240. She said that she was less than a block from her house when she got out of the defendant's car but that she ran in the opposite direction from her house. She said she knocked at a house with lights, but no one answered. She said that she was afraid that the defendant would return because he had stopped his car. She stated that she ran toward another car and screamed and that it stopped. She said that she told the driver that she had just been raped, that he took her to a pay telephone, and that she called 911.

The victim testified that later that day, she began crying when she identified the defendant's car in the impound garage. She said that on September 2, 1997, she met with Detective Clowers and identified the defendant as her attacker from a photograph array. She stated that when she first saw the defendant in the courtroom, she had some reservations about whether he was her assailant. She said that the defendant no longer had a mustache or beard, that his hair was thinner, and that he had gained weight. She said that she looked at the photograph array again and, at the time of her testimony, had no doubt that the defendant was the man who raped her.

On cross-examination, the victim testified that she did not recall returning to the Coliseum at 4:00 p.m. on July 26th or getting off at 8:00 p.m. She said that at 11:00 p.m., she was at BW3 waiting for her husband to finish work and that she returned to Labor World with two friends and then called her husband from there. She said that she could have passed BW3 on her way home but that her husband was no longer there at that time. She said that due to a misunderstanding, her husband had gone to Weigels, which was not on the way home from Labor World. She admitted that she was mad at her husband that evening because he wanted to go to a friend's house to get high on marijuana before they walked home and she did not want to go because she was feeling sick. She

said that she argued with her husband about the rape after she left the hospital where the rape examination was performed. She admitted that she told Detective Clowers that her fingerprints would be inside the car.

David Mason, a postal worker, testified as follows: In July 1997, he lived on Fifth Avenue. At 4:00 a.m. on July 27, 1997, he was driving home when he saw the victim coming toward him and screaming, "Help me." He stopped, and she told him that she had been raped. The victim appeared very scared. He took her to a pay telephone at a nearby Conoco gas station and stayed with her until the police arrived. Jack Price, the records specialist for the 911 system, testified that the dispatcher received a telephone call in the early morning hours of July 27, 1997, and that it sounded as if the person making the call was crying.

Officer Chris McCarter of the Knoxville Police Department (KPD) testified as follows: In the early morning hours of July 27, 1997, he received a dispatch to respond to a rape report. He located the victim with Mr. Mason at a Conoco station, and she was very upset and was crying. The victim said that she had just been raped at knife-point and gave him a license tag number, UDA-240, for her assailant's car. She described her attacker as a white male who was six feet tall; weighed one hundred eighty pounds; had blond hair and a tattoo on his left arm; and wore a t-shirt, blue shorts and a ball cap. An ambulance transported the victim to Baptist Hospital, where she gave the same description of her attacker. Around 6:00 or 6:30 a.m., Officer McCarter went to 2726 Delrose Avenue, the address he received as that relating to the car bearing the tag number given by the victim, and found a 1990 silver, four-door Nissan. The defendant's mother, who owned the car, said that the defendant had used the car the previous night. She showed Officer McCarter the building at the rear of the house where the defendant stayed, but the defendant was not there. Officer McCarter searched the immediate area but did not find the defendant. He impounded the car.

Mary Huskey, an emergency room nurse at Baptist Hospital, testified as follows: At 4:40 a.m. on July 27, 1997, she assisted Dr. Cauble in treating the victim who complained that she had been raped. She conducted a head to toe examination of the victim and found no bruises, abrasions, or tears. A notation on the victim's chart stated that the victim's vaginal wash revealed no mobile or immobile sperm.

Dr. Dan Cauble, an emergency room physician, testified as follows: He saw the victim between 4:30 and 5:30 a.m. on July 27, 1997. He took the victim's history, and she said that she had been raped vaginally and forced to perform oral sex between 4:20 and 4:30 a.m. and that her attacker had used a knife to force her to comply. She said that her assailant had not ejaculated in her vagina or mouth. She reported that she had last engaged in intercourse two days earlier. Dr. Cauble examined the victim, found no bruising or abrasions, and observed no tears or bruising on her genitals. His findings neither added nor detracted from the history given by the victim.

Terry Clowers, a detective with the KPD and the lead investigator in the case, testified as follows: In the early morning of July 27, 1997, he spoke with the victim at Baptist Hospital. The victim, who was crying, described her rapist as a white male, possibly six feet tall, weighing about

one hundred eighty pounds, with blond or brownish hair. She said that he wore a t-shirt, denim shorts, and a baseball cap. He had a tattoo on his left arm and used a large folding knife with a silver blade. She said he drove a small gray or silver car with the license plate number UDA-240. She said that once she saw the license plate, she recited the number to herself repeatedly in order to remember it. On July 28th, he took the victim and her husband to view a car that the police were processing in relation to her case. As they drove by the impound garage, the victim saw the car with the license plate number UDA-240 and began crying and screaming, "There's the car." He was not able to take the victim's statement at that time because she was too upset. The defendant completed a personal history form at the police department on July 28, 1997, and it revealed that he had a skull tattooed on his right arm. He said that he resubmitted the physical specimens collected in the investigation for new testing because they came back insufficient although the initial tests revealed the presence of sperm and he thought that new tests might result in a better finding.

Detective Clowers testified that the victim eventually told him that she was suppose to work at Labor World on the night of the offenses but became ill and decided to walk home. He testified about the route taken by the victim with the aid of a diagram prepared by a KPD crime analysis. The diagram shows that from Labor World, the victim walked up East Fifth Avenue and turned onto Polk Street. Detective Clowers testified that the victim told him that the defendant abducted her on the corner of Polk and Washington Avenue. The diagram reflects that the defendant raped and sexually assaulted the victim one block later at the corner of Washington and Olive Street. The victim fled one block up Washington, turned onto Spruce Street, and went two blocks before encountering the motorist who took her to the Conoco station. Detective Clowers stated that the victim told him that at one point, when the defendant approached her in his car and tried to pick her up, an African-American woman stepped forward and propositioned the defendant, who declined and drove away. Detective Clowers said that the victim's husband stated that he was supposed to meet the victim at Weigels that night.

Detective Clowers also testified as follows: The victim returned to the KPD on September 2, 1997, and looked at a photographic line-up. The victim first looked at black and white photographs and then at color photographs of the same people. Both times, the victim pointed to the defendant's photograph and said that she was sure that he was the man who had raped her. On the first day of trial, the victim volunteered that when she first saw the defendant in the courtroom, she did not think that he was her attacker because he was a different weight and did not have a beard. In the presence of the district attorney and the defense attorney, Detective Clowers showed the victim the same photograph array and told her that these were the same pictures that she had viewed before. She pointed directly to the defendant's picture and said that she had no doubt that he was the rapist. Detective Clowers agreed that aside from the absence of a scruffy beard and the further receding of his hairline, the defendant looked fairly the same at the time of trial as in the photographs.

Gerald Smith, a criminalist with the Knoxville Police Department, testified as follows: Between 6:45 and 7:15 a.m. on July 27, 1997, he went to 2726 Delrose Avenue and secured with crime scene tape a 1990 Nissan Sentra XE with a handicap license tag number UDA-240. At the time he arrived, other officers had searched the woods, and they continued to look for the defendant

during the thirty minutes that he was there. Later that morning, he processed the car at the police department's garage. He dusted the entire car for fingerprints, collected some partial finger and palm prints and some smudges, and turned these over to the identification unit. He said that if an occupant were moving around or struggling, he would find mostly smudges. He also said that he would not expect to collect any prints from the hard plastic of the car door because it was highly textured.

Dan Crenshaw, an expert in fingerprint identification from the KPD's criminalistics unit, testified as follows: He received palm prints from various locations in a Nissan Sentra XE with the license number UDA-240. The only usable print came from the outside door frame behind the window on the passenger side. He compared the print to those of the victim and was not able to identify it as her print.

Tennessee Bureau of Investigation (TBI) Agent Kelly Smith, a forensic scientist, testified as follows: She found no semen on the fabric taken from the car seat. She found semen along the back seam of the victim's shorts and on the vaginal swabs collected from the victim, but the DNA from both the shorts and the swab was insufficient to obtain a DNA profile. On cross-examination, she stated that semen degrades over time and that one possible explanation of the insufficiency of the DNA was degrading. Another possibility was that the amount of sperm in the sample was too small. The samples were retested in Nashville but the finding was the same – the tests revealed no DNA profile other than the victim's.

Stan Bunch testified as follows: In 1997, he was the general manager for Labor World, and the victim was one of his employees. On July 26, 1997, Labor World sent the victim to clean the Knoxville Civic Coliseum. She reported to the Coliseum at 4:00 a.m. and left at 9:00 a.m. for a total of five hours work. She returned to the Coliseum at 4:00 p.m. and worked until 8:00 p.m. for a total of four hours work. The victim was probably scheduled to work at the Coliseum again at midnight on the 26th because the Coliseum management prefers to have the same workers, but no record exists to show that she was sent back to the Coliseum at that time.

John David Harrison testified as follows: In July 1997, he and the victim had been married for two or three months. He worked at BW3 in the Old City. On July 26, 1997, he went to work around 4:30 or 5:00 p.m., leaving the victim at their home. The victim told him that she was working at the Coliseum that evening and would be starting around midnight. The victim called him when she finished work, said she was feeling ill, and wanted him to meet her. Based upon his telephone conversation with the victim, he believed that they were to meet at Weigels and walk home together. He did not recall arguing with the victim that evening about him smoking marijuana. He left work around 2:00 or 3:00 a.m. and walked toward Weigels, thinking that he would meet the victim on her way from the Coliseum. He waited for the victim at Weigels for twenty or thirty minutes, but she never came. After stopping at a friend's house, he walked home, arriving around 4:00 a.m. When he got there, the landlord told him that the police had been there looking for him because the victim had a problem. He said that if the victim had not had any problems, she probably would have arrived home before him.

Anonda Joiner, the victim's younger sister, testified as follows: Despite having the typical problems that sisters have, she and the victim had remained close. She frequently left her three children, ages six, three, and newborn, in the victim's care. She did not know if the victim had a reputation for being truthful or for being dishonest. She discussed the offenses with the victim once briefly, but the victim did not feel like discussing them. She remembered telling Mike Cohan, the defendant's investigator, that the victim did not seem very upset when they discussed the case. Instead, the victim seemed withdrawn, which she thought to be unusual because the victim was typically a very emotional and dramatic person.

Michael Cohan, a private investigator, testified as follows: The defendant hired him to investigate the case. On May 8, 1998, he spoke with the victim at her home. She said that she initially thought that the defendant had a gun but then realized that he had a knife. She told him that her fingerprints would be inside the defendant's car because she put her hand on the gearshift handle. She told him that she hit the defendant on the back during the rape. Mr. Cohan said that in describing what happened, the victim never mentioned jumping over any fences, but she did remark that she was able to take care of herself. He admitted that the victim spoke freely with him.

Mr. Cohan said that he spoke with the victim's husband, who told him that the victim said she would be working until 10:00 or 11:00 p.m. on the evening before the offenses and that she called her husband at midnight that night. He spoke with Anonda Joiner, who told him that the victim cried easily. Ms. Joiner told him that the victim's reaction to the offenses was unusually flat and that on one occasion, the victim seemed to think that the whole incident was funny. He admitted that while investigating the case, he found nothing to indicate that before the offenses, the victim had a personal vendetta against the defendant.

## I. SUFFICIENCY OF THE PRESENTMENT

The defendant contends that the trial court's failure to dismiss the indictment constitutes plain error because it does not allege an essential element, his 1987 conviction for rape. First, for clarification purposes, we note that the defendant was charged by presentment, not indictment. However, it does not change the substance of the defendant's claim.

The defendant maintains that the repeat violent offender statute, Tenn. Code Ann. § 40-35-120, increases the sentence for aggravated rape beyond the maximum Class A sentencing range of fifteen to sixty years to life imprisonment without possibility of parole based upon the existence of prior convictions for violent offenses. He argues that the dramatic increase in his sentence based upon his prior rape conviction essentially serves to convict him of a greater offense without the jury making a factual finding regarding his prior conviction. Thus, he contends, the imposition of a sentence of life without parole based upon his prior rape conviction violates his rights to due process and a fair trial because the jury was not permitted to find an essential element of the offenses. See Apprendi v. New Jersey, 530 U.S. 466, ___, 120 S. Ct. 2348, 2365 & n.19 (2000). The state contends that the repeat violent offender statute is a recidivist statute that does not create a separate offense but, instead, merely enhances punishment for those who repeatedly commit violent offenses.

In Apprendi, the United States Supreme Court struck down a New Jersey hate crime statute that provided for the judge to enhance the defendant's sentence above the maximum in the range if the crime was racially motivated. 530 U.S. at ___, 120 S. Ct. at 2366. Justice Stevens, writing the lead opinion, which is joined by Justices Souter and Ginsburg, concludes that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at ___, 120 S. Ct. at 2362-63. Justice Thomas joins "the opinion of the Court in full" but writes a separate concurring opinion advocating that those facts that must be submitted to the jury include the fact of a prior conviction. Apprendi, 530 U.S. at ___, 120 S. Ct. at 2367-69 (Thomas, J., concurring, joined in part by Scalia, J.). Justice O'Connor, joined by Chief Justice Rehnquist and Justices Kennedy and Breyer, concludes that all sentencing facts, including prior convictions, can be left for the sentencing judge's determination and do not have to be charged to the jury. Id. at ___, 120 S. Ct. at 1286-87, 1292. Although the Apprendi Court is split three ways, a majority of the justices – the four dissenters and the three justices joining in the lead opinion – agree that recidivism is not a fact that must be charged to the jury.

In the lead opinion in Apprendi, Justice Stevens states that it "'is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.'" Id. at ___, 120 S. Ct. at 2363 (quoting Jones v. United States, 526 U.S. 227, 252, 119 S. Ct. 1215, 1228 (1999) (Stevens, J., concurring)). Despite the sweeping nature of this holding, Justice Stevens discusses an exception when the challenged fact that increases the punishment above the maximum in the range is a prior conviction. Apprendi, 530 U.S. at ___, 120 S. Ct. at 2362. This exception turns upon the Court's earlier holding in Alamendarez-Torres v. United States, 523 U.S. 224, 118 S. Ct. 1219 (1998), which involved an alien who pled guilty to entering the country unlawfully after being deported, a crime which carried a maximum sentence of two years. Because the defendant was originally deported for committing three aggravated felonies, the statute permitted his sentence to be increased to a maximum of twenty years. The Court considered whether the portion of the statute that increased the sentence created a separate crime or was only a penalty provision permitting an enhanced sentence based upon a prior conviction. The Court held that recidivism, "a traditional, if not the most traditional basis for a sentencing court's increasing an offender's sentence," relates only to punishment and not to the nature of the offense. Alamendarez-Torres, 523 U.S. at 243-44, 118 S. Ct. at 1230-31.

In Apprendi, Justice Stevens notes that the holding in Alamendarez-Torres hinged upon the fact that the increased sentence was based upon the defendant's prior convictions, which had been obtained in proceedings with considerable procedural safeguards. Apprendi, 530 U.S. at ___, 120 S. Ct. at 2361. "Both the certainty that procedural safeguards attached to any 'fact' of prior conviction, and the reality that [the defendant] did not challenge the accuracy of that 'fact' in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a 'fact' increasing punishment beyond the maximum of the statutory range." Id. at ___, 120 S. Ct. 2362 (footnote omitted).

The defendant contends that a logical reading of Apprendi reveals that the distinction made for recidivist statutes in Alamendarez-Torres no longer applies. He relies upon Justice Thomas's concurring opinion in Apprendi, which parts from the lead opinion in its insistence that a prior conviction should be charged to the jury like any other fact that enhances the sentence above the maximum in the range. Apprendi, 530 U.S. at ___, 120 S. Ct. at 2368-69 (Thomas, J., concurring, joined by Scalia, J.). Justice Thomas opposes the holding in Alamendarez-Torres, contending that if a fact provides a legal basis for increasing the defendant's punishment, it forms an element of the crime even if the particular fact is a traditional basis for increasing the sentence. Id. at ___, 120 S. Ct. at 2379 (Thomas, J., concurring). Although noting that recidivism is a traditional basis for increasing a sentence, Justice Stevens in the lead opinion emphasizes that a prior conviction is different from other enhancing facts in that the defendant has already gained what he seeks with regard to the enhancing fact – a jury's determination beyond a reasonable doubt of the conviction's validity or the procedural equivalent thereof. Apprendi, 530 U.S. at ___, 120 S. Ct. at 2361-62.

In dismissing Alamendarez-Torres, the defendant also relies upon Justice O'Connor's dissenting opinion in Apprendi, which finds no distinction between a prior conviction and other sentencing "facts" that enhance the sentence above the maximum in the range. Apprendi, 530 U.S. at ___, 120 S. Ct. at 2396 (O'Connor, J., dissenting). Justice O'Connor, joined by Chief Justice Rehnquist and Justices Kennedy and Breyer, reasons that Alamendarez-Torres repudiated the majority's holding that an increase in the maximum punishment triggers a constitutional elements rule. Id. at ___, 120 S. Ct. at 2387 (O'Connor, J., dissenting). In other words, Justice O'Connor would hold that judicial fact finding in sentencing should not be limited to prior convictions but should be extended to all sentencing facts. See id. at ___, 120 S. Ct. at 1286-87. Needless to say, Justice O'Connor's dissent neither rejects Alamendarez-Torres nor supports the defendant's position on this issue.

Although Justice Stevens indicates that the Court could revisit its holding in Alamendarez-Torres, he continues to recognize the holding in Alamendarez-Torres as a narrow exception to the rule that a fact which serves to enhance the sentence above the maximum in the range must be charged to the jury and determined beyond a reasonable doubt. Apprendi, 530 U.S. at ___, 120 S. Ct. at 2362. As in Alamendarez-Torres, the "fact" in the present case that serves to increase the sentence above the maximum sixty-year term is the defendant's 1987 rape conviction. As a prior conviction, this fact falls squarely within the exception recognized by the Supreme Court in Apprendi. The defendant enjoyed substantial procedural safeguards at the time he entered this plea. Furthermore, as noted by the state, the defendant does not challenge the validity of his 1987 conviction.

The historical treatment of recidivist statutes in Tennessee supports the exception of prior convictions from the facts that comprise an essential element of the offense. Although a defendant's status as a habitual criminal under the former Habitual Criminal Act, which imposed a life sentence based upon the defendant's fourth conviction of certain specified felonies, was determined by the jury, this was not constitutionally compelled but was a function of statute. See Tenn. Code Ann. § 39-1-801 (repealed 1989). Similarly, the legislature requires that a jury determine that a defendant

has previously been convicted of the same offense in order to enhance punishment for a subsequent conviction for that offense. Tenn. Code Ann. § 40-35-203(e). Apparently due to distrust of a powerful judiciary, the legislature transferred sentencing power from the judge to the jury in 1829. See State v. Mackey, 553 S.W.2d 337, 342 (Tenn. 1967), superseded on other grounds by Tenn. R. Crim. P. 37(b) & T.R.A.P. 3(b); see also Public Acts of 1829, ch. 23 § 76 (providing for the switch to jury sentencing in two years); 1831 Tenn. Pub. Acts, ch. 83 § 1 (establishing jury sentencing); see also Woods v. State, 130 Tenn. 100, 107, 169 S.W. 558, 559 (Tenn. 1914) (holding that the "right to have the jury assess the punishment was not a part of the right of trial by jury at common law"). When the legislature enacted the Habitual Criminal Act in 1932, it specified that the jury would determine whether a defendant was a habitual criminal, but it did not require that the habitual criminal accusation be charged in the indictment. 1932 Pub. Acts, ch. 22 §§ 4-6. Our supreme court affirmed this procedure, holding that although it might be commendable to give the defendant notice of his potential habitual criminal status in the indictment, such was not necessary because

> in a prosecution for a second or subsequent offense, the fact of a prior conviction, proof of which will authorize the imposition of an increased punishment, does not constitute an element of the offense charged, and . . . a statement of the fact is not essential to a statement of the "nature and cause of the accusation."

McCummings v. State, 175 Tenn. 309, 313, 134 S.W.2d 151, 153 (Tenn. 1939) (quoting Tenn. Const. art. I, § 9).

A federal court subsequently held that the procedure described in the Habitual Criminal Act violated a defendant's due process rights because it failed to give him any pretrial notice of the habitual criminal accusation. Rhea v. Edwards, 136 F. Supp. 671, 682 (M.D. Tenn. 1955), aff'd 238 F.2d 850 (6th Cir. 1956); see Bomar v. State ex rel Boyd, 312 S.W.2d 174, 178 (Tenn. 1958) (limiting Rhea to a ruling on notice under the Habitual Criminal Act). The Rhea court noted that the Tennessee Legislature had apparently recognized the problem presented by lack of notice under the Act because it amended the Act in 1950, requiring that the habitual criminal accusation be included in the indictment for the underlying substantive offense. Rhea, 136 F. Supp. at 682-83. Despite these changes, Tennessee courts continued to emphasize that the Habitual Criminal Act did "not create an independent crime but a status prescribing circumstances under which there is an enhanced penalty for the present crime." Harrison v. State, 217 Tenn. 31, 34, 394 S.W.2d 713, 714 (Tenn. 1965); State v. Duffle, 665 S.W.2d 402, 404 (Tenn. Crim. App. 1983). Notably, the violent offender statute at issue in this case does require the state to provide the defendant pretrial notice that the defendant qualifies for enhanced punishment under the statute. Tenn. Crim. Ann. § 40-35-120(i)(2). Thus, the history of the Habitual Criminal Act does not suggest that our courts would treat the fact of a prior conviction as an essential element of the crime.

The defendant argues that the violent offender statute is not a recidivist statute and that sections 40-35-111 and -112 of the code encompass recidivism while section 40-35-120 deals with prior convictions for specific offenses. Initially, we note that a recidivist is a "habitual criminal; a criminal repeater." Black's Law Dictionary 878 (6th ed. 1991); see also Webster's Third New

International Dictionary 1895 (1993) (defining recidivist as "one who relapses," specifically "one who persists in crime," a habitual criminal). Section 40-35-111 provides the terms of imprisonment and the authorized fines for the various classes of felonies and misdemeanors. Section 40-35-112 gives the possible sentences for each felony classification within each of the three sentencing ranges. Of these two sections, only 40-35-112 can be construed as taking into account the defendant's commission of other crimes, and it only does so indirectly because the three sentencing ranges described therein correspond to the defendant's classification as a standard, multiple, persistent, or career offender. See Tenn. Code Ann. §§ 40-35-105 to -108. The trial court determines a defendant's status as a standard, multiple, persistent, or career offender by examining the number and classification of the defendant's prior felony convictions. Tenn. Code Ann. §§ 40-35-105(a), -106(a), -107(a), -108(a). The fact that these sections take into account a defendant's tendency to reoffend does not foreclose the possibility that other portions of the sentencing act may also relate to recidivism. See, e.g., Tenn. Code Ann. 40-35-114(1) (allowing the trial court to enhance the defendant's sentence based upon its finding that the defendant has prior convictions in addition to those necessary to establish the sentencing range). In this respect, we conclude that section 40-35-120 is a recidivist statute because it imposes a sentence of life imprisonment without the possibility of parole based upon the defendant's previous commission of certain violent offenses in addition to the triggering offense, thereby looking to the defendant's status as a criminal repeater.

Finally, the defendant likens his case to United States v. Rebmann, 226 F.3d 521, 524-25 (6th Cir. 2000), which applied Apprendi and held that the fact that a death resulted from drug distribution, which could enhance the defendant's sentence above the maximum of twenty years to life imprisonment, was an element of the offense and must be proven beyond a reasonable doubt. The defendant's reliance upon Rebmann is misplaced because the enhancing fact in that case was not a prior conviction and, thus, did not fall into the exception for prior convictions created by Apprendi in response to Alamendarez-Torres. Furthermore, in Rebmann, the court emphasized that the statute in question allowed the trial court to determine that a death resulted from drug distribution by a preponderance of the evidence standard. The court observed that based upon the evidence in the case, elevating the standard to that of beyond a reasonable doubt could have affected the outcome of the case. Rebmann, 226 F.3d at 522. In this respect, under the repeat violent offender statute, the trial court must find "beyond a reasonable doubt that the defendant is a repeat violent offender" before it may impose a life sentence. Tenn. Code Ann. § 40-35-120(g). Thus, the defendant has failed to prove that the presentment in this case was insufficient because it failed to allege his 1987 rape conviction as an element of the offenses.

## II. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions for aggravated rape. He argues that his convictions are based solely upon the victim's uncorroborated testimony, which is so unreliable and contradictory that it provides an unsafe basis for the verdict. The state contends that the evidence is sufficient.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

"Aggravated rape is unlawful sexual penetration of a victim by a defendant or the defendant by a victim accompanied by . . . [f]orce or coercion . . . used to accomplish the act and the defendant is armed with a weapon . . . ." Tenn. Code Ann. § 39-13-502(a)(1). Sexual penetration includes sexual intercourse and fellatio. Tenn. Code Ann. § 39-13-501(7).

Taken in the light most favorable to the state, the proof at trial reveals that after driving past the victim several times, the defendant got out of his car and ordered her into the car while wielding a knife. The victim testified that she got into the car because she believed that the defendant would kill her if she refused. The defendant began driving, pulled his shorts down, and demanded oral sex. The victim said that she complied with this order because he told her that if she performed oral sex, she would not be hurt. While the victim performed oral sex upon the defendant, he held her neck with one hand and continued to hold the knife. When she refused to continue, the defendant ordered her to lock the car door, stopped the car, got out, pulled her shorts down, and penetrated her vagina with his penis. He ejaculated on the passenger's seat. After raping the victim, the defendant told her to get out of the car, and he drove away. The victim memorized the defendant's license plate number and subsequently identified the car the defendant was driving, as well as the defendant himself, from a photograph array. Mr. Mason, Officer McCarter, and Detective Clowers, all of whom encountered the victim soon after the offenses, described her as very upset or crying. Jack Price testified that the victim sounded as if she were crying on the audio tape of the 911 call reporting the rapes.

The defendant contends that because the victim's testimony is uncorroborated and contradictory, it cannot support his convictions. He argues that no physical evidence links him to the rapes or even proves that a rape occurred. He claims that instead, the lack of physical evidence – specifically the TBI's inability to obtain a DNA profile from sperm collected from the vaginal wash and the victim's shorts, the absence of the victim's fingerprints or palm prints in the defendant's car, and the absence of semen on the fabric from the passenger's seat – contradicts the victim's testimony.

The defendant also maintains that the victim's testimony is so contradictory that it constitutes an unreliable basis for the verdicts against him. He points to the victim's reservation about his identity as her rapist on the day of trial and her inconsistencies regarding the time she called her husband, the time she began walking home, and where she was on Fifth Avenue. He contends that the victim testified that she was on her way home from work when the offenses occurred but that she told Detective Clowers that she was suppose to work that evening, felt ill, and decided to return

home. He also argues that her testimony that she was afraid of him is belied by her failure to take a different route home once she saw his car several times and her refusal to continue oral sex. He claims that her account of the rape is contradicted by her failure to run home or to a friend's house and the fact that she instead ran to the car of a strange man to seek help. He contends that her testimony that he continued to drive, held a knife, and held her head to his crotch is physically impossible. Finally, the defendant contends that on one occasion, the victim said that her attacker ejaculated inside of her and on another occasion, she said that he ejaculated on the passenger seat. To the contrary, we have reviewed the record, and it does not support this contention.

The state contends that the jury accredited the victim's testimony that she had been raped. It argues that although the TBI was not able to obtain a DNA profile from the sperm, the presence of sperm on the victim's shorts and in the vaginal wash corroborates the victim's accusation of rape. It argues that the victim consistently described her attacker on two occasions and selected his picture from two photograph arrays. It maintains that her credibility was underscored by her voluntary admission that she had reservations about the defendant's identity on the day of trial and her subsequent confirmation that he was her assailant by again selecting his picture from a photograph array. The state argues that the victim consistently identified the license plate number and described the car the defendant used on the night of the offenses. It contends that the testimony of Mr. Mason, Officer McCarter, and Detective Clowers that the victim was visibly upset on the morning of the offenses corroborates her testimony.

Generally, a defendant may be convicted upon the uncorroborated testimony of one witness. See Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974); see also Shelley v. State, 95 Tenn. 152, 155-56, 31 S.W. 492, 493 (1895) (noting that a victim of incest by force is not an accomplice and that a conviction may rest upon such victim's uncorroborated testimony); State v. McKnight, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994) (holding that a "defendant can be convicted of simple rape based solely upon testimony of the victim"). However, exceptional circumstances may require this court to discredit a witness's testimony as a matter of law:

> [A]lthough as a general rule a conviction may rest upon the testimony of a single witness, though it be contradicted by others or appear uncertain or inconsistent, the rule does not apply if the testimony of such single witness is not of a cogent and conclusive nature, and "if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon."

Letner, 512 S.W.2d at 649 (citing 23 C.J.S. Criminal Law § 903 (19)). Furthermore, a witness's contradictory statements concerning the same fact act to cancel each other if the contradiction is unexplained and no other evidence exists to corroborate either statement. State v. Matthews, 888 S.W.2d 446, 449-50 (Tenn. Crim. App. 1993).

In this case, the victim's testimony sufficiently sustains the conviction. Although her testimony contains inconsistencies, the contradictions do not relate to her account of the offenses themselves. Her initial uncertainty on the day of trial about the defendant being the man who

attacked her is explained by the changes in his appearance in the intervening almost two-year period since the offenses. Regarding the position of the defendant's hands during the first act of rape, the jury could have reasonably believed that the defendant held the steering wheel and the knife with one hand and the victim's head with the other. Finally, the defendant's contentions regarding the appropriateness of the victim's reactions in light of her fear go to the weight of her testimony, a matter solely within the province of the jury. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987) (holding that the credibility and weight to be given to a witness's testimony are issues to be resolved by the trier of fact). The evidence is sufficient to support the defendant's convictions for aggravated rape.

### III. IN-COURT IDENTIFICATION

The defendant contends that the trial court erroneously admitted the victim's in-court identification of him as the rapist because the unreliability of that identification rendered it more prejudicial than probative. He argues that this court should view the victim's in-court identification to be plain error. The state contends that the defendant has waived this issue by failing to object at trial. Alternatively, it argues that the in-court identification was not unreliable and that the jury could have convicted the defendant even without the in-court identification based upon the victim's initial identification of the defendant in a photograph array.

The testimony of the victim reveals that when she saw the defendant in the courtroom, she told the victim/witness coordinator that she was not sure that the defendant was the man who raped her. The prosecutor brought this to the court's and defense counsel's attention. Defense counsel agreed that the victim could be shown another printout of the photograph array that did not contain writing identifying the picture that the victim had selected previously. In the presence of the prosecutor, defense counsel, and Detective Clowers, the victim again selected the defendant's photograph. Detective Clowers testified that the victim pointed directly to the defendant's picture and said that she had no doubt that he was the man who raped her. The victim testified that the defendant no longer had a mustache or beard, that his hair was thinner, and that he had gained weight since the time of the offenses. She said that she looked at the photograph array again and, at the time of her testimony, had no doubt that the defendant was the man who raped her. On cross-examination, she agreed that Detective Clowers told her that these were the same photographs arranged in the same order as the earlier array.

The defendant never objected to the victim's identification of the defendant as her attacker during her testimony. A party who is "responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error" is not entitled to relief. T.R.A.P. 36(a). The defendant has waived the issue of the admissibility of the victim's in-court identification by failing to make a contemporaneous objection. See State v. Burton, 751 S.W.2d 440, 448 (Tenn. Crim. App. 1988). The defendant asks us to consider the identification to be plain error.

Initially, we note that this court will not review an issue for plain error when the defendant has affirmatively waived the issue rather than simply failed to object. See State v. Adkisson, 899

S.W.2d 626, 641 (Tenn. Crim. App. 1994) (holding that the court will not determine plain error when the accused affirmatively "waived the issue for tactical reasons"); see also State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (adopting the considerations in Adkisson). In this case, the prosecutor informed the court and defense counsel that the victim had expressed reservations about the defendant being her attacker. The prosecutor noted that the state could present the original photograph array that bore the victim's initials over the defendant's photograph and the testimony of Detective Clowers, who was present when the victim selected the defendant's picture in that array. The prosecutor wanted to confirm with the victim that the person in the photograph was her rapist and then to proceed with the trial. At that point, the defendant objected to the state showing the victim the original photograph array with the victim's initials over the defendant's picture. The state proposed to reprint the photograph array without the initials, which the trial court allowed. The victim then selected the defendant's photograph in the presence of defense counsel. The defendant made no other objection about the victim's identification. The victim testified and identified the defendant as the rapist. The defendant initially did not cross-examine the victim about this matter. After the trial court excused the victim, defense counsel asked the court to allow her to recall the victim because counsel had forgotten to question her about her identification of the defendant at the start of trial. Defense counsel then cross-examined the victim about her doubts upon seeing the defendant in the courtroom and what Detective Clowers told her during the subsequent photograph array. Because the defendant assented to the state showing the victim the photograph array after the victim's initials were removed, the defendant has affirmatively waived this issue. In any event, we note that counsel made a thorough cross-examination of the victim that would bear on the reliability of her in-court identification. We see no plain error.

## IV. ADMISSIBILITY OF THE VICTIM'S PRIOR ACCUSATION OF RAPE

The defendant contends that the trial court violated his right to due process by excluding evidence that three years before the present offenses, the victim falsely told family members that she had been raped in order to provide an excuse for coming home late. He argues that this evidence is not prohibited by Rule 412, Tenn. R. Evid., because it illustrates the victim's untruthfulness rather than her past sexual behavior. He maintains that the victim's previous false accusation of rape is relevant to her credibility and to her motive to lie about the present offenses. The state contends that the alleged prior false accusation is irrelevant and constitutes inadmissible propensity evidence. See Tenn R. Evid. 401, 404(b).

On the morning of the original trial date, the state moved the court to exclude any questions concerning the victim's prior sexual behavior under Rule 412, Tenn. R. Evid., because the defendant had not complied with the notice requirements of that rule. The defendant responded that he did not intend to ask about the victim's prior sexual encounters but that he did intend to ask about the victim's prior claim that she had been raped and subsequent recanting of that claim, arguing that this related to the victim's credibility. Defense counsel stated that she learned of this false claim from several sources and that the victim made this claim to get out of trouble when she did not arrive home on time and then recanted before the police were called. Defense counsel argued that the defendant gave no notice under Rule 412 because this evidence illustrated the victim's propensity

to lie rather than her sexual behavior. The state responded that even if not covered by Rule 412, Rule 404(b), Tenn. R. Evid., excluded the evidence because its purpose was to show the witness's propensity for a given character trait. The trial court ruled that the evidence was inadmissible due to the defendant's failure to comply with Rule 412.

Following a continuance, the defendant appeared again for trial and moved the court to reconsider its earlier ruling, contending that he had now complied with the Rule 412 notice requirements and that the victim's prior false claim of rape was relevant to her credibility. Defense counsel stated that the victim's family members said that she made this prior false accusation when she was seventeen or eighteen years old but that the six-year time lapse since the false accusation did not exclude the information because the victim could still have the same pattern of behavior. The state argued that the prior false claim was irrelevant and that, if considered a prior bad act by the victim, it would not come in under Rule 404(b), Tenn. R. Evid., because it did not prove anything other than propensity. It argued that in order for the prior false accusation to be admissible under Rule 608, Tenn. R. Evid., the court must hold a hearing to determine if a reasonable factual basis exists for the inquiry and if the accusation has probative value. The court stated that its earlier ruling would stand.

The resolution of this issue involves the interplay between the evidentiary rules governing relevance and those governing the impeachment of witnesses. We begin by noting that the defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 998 (1987); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000); State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992). Denial of the defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308, 318, 94 S. Ct. 1105, 1111 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); Coffee v. State, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This court will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. Dishman, 915 S.W.2d at 463; State v. Fowler, 213 Tenn. 239, 253, 373 S.W.2d 460, 466 (1963).

We also recognize that the "Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." Brown, 29 S.W.3d at 432; Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 1049 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.") Although this right is critical, at times it "'must yield to other legitimate interests in the criminal trial process,'" including "'established

rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Brown, 29 S.W.3d at 432 (quoting Chambers, 410 U.S. at 295, 302, 93 S. Ct. at 1046, 1049). With these rights in mind, we turn to the evidentiary rules that govern the admission of an alleged prior false accusation of rape made by the victim in an aggravated rape trial.

### A. Inadmissibility of a Rape Victim's Sexual Behavior

Generally, evidence of specific instances of an aggravated rape victim's sexual behavior are inadmissible. Tenn. R. Evid. 412(c).[1] The sexual behavior is "sexual activity of the alleged victim other than the sexual act at issue in the case." Tenn. R. Evid. 412(a). "This broad definition 'deals with sexual intercourse as well as every other variety of sexual expression.'" State v. Sheline, 955 S.W.2d 42, 47 n.6 (Tenn. 1997) (considering the victim's kissing another person on the evening of the offense under Rule 412) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 412.2, at 241 (3d ed. 1995)). The defendant contends and, at oral argument, the state conceded that the evidence that the defendant sought to introduce did not constitute "sexual behavior" as contemplated under Rule 412. We agree. Thus, the trial court erred in using Rule 412 to exclude the evidence in question.

### B. Proof of Other Crimes, Wrongs, or Acts to Show Actions in Conformity

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at

---

[1]Evidence of specific instances of a victim's sexual behavior can be admitted if the defendant follows the prescribed procedures in subsection (d) and if the evidence is:

(1) Required by the Tennessee or United States Constitution, or

(2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or

(3) If the sexual behavior was with the accused, on the issue of consent, or

(4) If the sexual behavior was with persons other than the accused,
    (i) to rebut or explain scientific or medical evidence, or
    (ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
    (iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c).

a certain time. Tenn. R. Evid. 404(a). In other words, a party may not use character evidence to show that a person acted in a particular way because he or she had a propensity to do so. State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999); State v. Parton, 694 S.W.2d 299, 304 (Tenn. 1985) (observing that evidence of another crime is not admissible to show that the defendant is the kind of person who would tend to commit the offense); State v. Tizard, 897 S.W.2d 732, 743 (Tenn. Crim. App. 1994) (noting that character evidence may not be used to show a propensity to act). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, this evidence may be admitted for other purposes if relevant to some matter actually in issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); Howell, 868 S.W.2d at 254. Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404, Advisory Commission Comment; Parton, 694 S.W.2d at 302. Admissibility of other crimes, wrongs or acts is also contingent upon the trial court finding by clear and convincing evidence that the prior crime, wrong or act was actually committed. Parton, 694 S.W.2d at 303; see, e.g., State v. Holman, 611 S.W.2d 411, 412-13 (Tenn. 1981). The jury may consider evidence admitted under 404(b) as substantive evidence at trial.

Before the trial court may permit evidence of a prior crime, wrong or act, the following procedures must be met:

(1) The court upon request must hold a hearing outside of the jury's presence;

(2) The court must determine that a reasonable factual basis exists for the inquiry; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b), Tenn. R. Evid., absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). "However, in view of the strict procedural requirements of Rule 404(b), the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." Id.

In order to prove a prior bad act, the party seeking to introduce the evidence must show that the evidence is relevant to some material issue at trial. The defendant contends that the victim's prior false accusation of rape is relevant to her credibility and that it shows her motive to lie in this case. Essentially, he argues that the fact that the victim had previously lied about being raped shows that she is lying this time as well. Use of a bad act to show that the actor acted in conformity with that act in the present case is typically the very type of evidence that Rule 404(b) seeks to exclude. Courts generally view this type of propensity evidence with disdain because of its tendency to

-18-

prejudice the jury against the witness, and they approach this evidence from the position that it should be excluded. See State v. Rounsaville, 701 S.W.2d 817, 820 (Tenn. 1985) (holding that the "starting point in considering testimony regarding prior offenses, when offered as substantive evidence of guilt and not merely for purposes of impeachment, is a rule of exclusion").

Because of the unique role that the credibility of the victim plays in many sexual crimes, some jurisdictions have effectively created a special exception to their evidentiary rules excluding extrinsic evidence of prior bad acts in order to admit evidence that the victim has previously falsely accused someone of a sexual crime. See West v. State, 719 S.W.2d 684, 687 (Ark. 1986) (holding that evidence of prior false claim to be admissible to discredit the credibility of the victim as well as to raise doubt about the truth of the current charges); People v. Hurlburt, 333 P.2d 82, 85-87 (Cal. Dist. Ct. App. 1958) (advocating a liberal rule for admitting evidence of the victim's prior false accusations of sexual assault in order for the jury to have sufficient information to render a just verdict); Smith v. State, 377 S.E.2d 158, 160 (Ga. 1989) (holding that prior false accusations of sexual offenses are admissible to attack the victim's credibility and substantively to prove that the present offense did not happen); People v. Evans, 40 N.W. 473, 478 (Mich. 1888) (holding that evidence of prior false accusations shows that the victim has a "morbid condition of mind and body" and helps explain the current charges); Miller v. State, 779 P.2d 87, 90 (Nev. 1989) (creating an exception to rule prohibiting extrinsic evidence if the witness denies fabrication on cross-examination for evidence of prior false accusations in sexual assault cases); State v. Izzi, 348 A.2d 371, 372-73 (R.I. 1975) (holding that the defendant could present extrinsic evidence of similar false accusations against other attendants at the residential mental health facility); Clinebell v. Commonwealth, 368 S.E.2d 263, 266 (Va. 1988) (holding that if the victim denies making prior false accusations of sexual assault on cross-examination, the defendant may present extrinsic proof of the accusations); Harriett R. Galvin, Shielding Rape Victims in the State and Federal Courts: A Proposal for the Second Decade, 70 Minn. L. Rev. 763, 861 (1986) (explaining that some courts permit the "false allegation evidence . . . not . . . to impeach the complainant's general character for truthfulness, but instead . . . to show a propensity to charge rape falsely . . . [thereby] simply ignor[ing] the fact that admitting evidence under this theory violates the general rule forbidding evidence of character to prove conforming conduct"); see also Covington v. State, 703 P.2d 436, 441-42, modified on other grounds on rehearing 711 P.2d 1183 (Alaska Ct. App. 1985) (holding that defendant seeking to present extrinsic evidence of the victim's prior false accusations of sexual assault must first obtain a jury-out determination that the prior accusations are false); State v. Barber, 766 P.2d 1288, 1290 (Kan. Ct. App. 1989) (holding that the defendant can cross-examine victim about prior false accusation, and if the victim denies making the accusation, the defendant may put on evidence regarding the accusation); Beck v. State, 824 P.2d 385, 388 (Okla. Crim. App. 1991) (extending the holding in Woods v. State, 657 P.2d 180, 182 (Okla. Crim. App. 1983), to introduction of extrinsic evidence of a prior false accusation of rape if the victim denies the falsity of the accusation on cross-examination). These jurisdictions have primarily focused upon the importance of the victim's credibility when he or she is the only witness aside from the defendant who can testify to the events surrounding the offense. Hurlburt, 333 P.2d at 84; Miller, 779 P.2d at 89. Some jurisdictions have determined that evidence of prior false accusations of sexual assault

goes to the victim's state of mind or motive to make the present charges. West, 719 S.W.2d at 687; Evans, 40 N.W. at 478.

The Texas Court of Criminal Appeals has strongly rejected the creation of a per se sex offense exception to the exclusion of extrinsic evidence of specific conduct for the purpose of attacking the victim's credibility. Lopez v. State, 18 S.W.3d 220, 225 (Tex. Crim. App. 2000) (analyzing, pursuant to Rule 608(b), the admission of extrinsic evidence of the victim's prior, allegedly false accusation of physical abuse). The court reasoned that credibility "of a witness is no more important in sex offenses than in any other case":

> Any case can involve a swearing match between two witnesses: an assault in which the defendant and the victim are alone and the defendant threatens the victim with imminent bodily injury; a kidnapping in which the defendant restrains the victim in an isolated location and the victim eventually escapes; an attempted theft in which the defendant and the victim are alone and the defendant grabs the victim's purse but is unable to get it away from the victim. In each of these examples, there is no physical evidence and there are no additional witnesses to the crime. In contrast, although some sex offenses have no corroborating physical evidence, many sex offenses do–such as evidence of victim penetration or traces of the attacker's DNA. So the complainant's and the defendant's credibility are no more critical issues in sex offense cases than in any other type of case.

Id. at 224. Furthermore, it viewed the emotional nature of sex offense cases to provide more reason not to admit extrinsic evidence and risk confusing the jury with collateral facts. Id. Finally, it reasoned that the "probative value of such evidence flows from the inference it raises as to the complainant's propensity to make false claims . . . ." Id. at 225; see Hughes v. Raines, 641 F.2d 790, 793 (9th Cir. 1981) (observing that presenting evidence of a prior false accusation of rape is asking the jury to infer that because the victim made a false accusation before, she is making a false accusation now); State v. Ellsworth, 709 A.2d 768, 772-73 (N.H. 1998) (reasoning that because no clear connection between the motives for the prior accusations of sexual voyeurism and theft and the current charge of sexual assault exists, the only logical relevance of the prior accusations relate to the victim's propensity to lie in violation of Rule 404(b)). Thus, the court rejected a per se sex offense exception to the rule against the admission of extrinsic evidence of specific conduct in favor of a case-by-case examination of the evidence to determine if the Confrontation Clause demanded its admission. Id.

The majority of jurisdictions that have addressed this issue limit the defendant's use of evidence of a prior false accusation to impeachment similar to Rule 608(b), Tenn. R. Evid. These jurisdictions permit the defendant to impeach the victim's credibility with the prior false accusation by cross-examining the victim about it provided the defendant can show that the accusation is false but do not permit the defendant to produce substantive evidence of the prior false accusation. Hughes v. Raines, 641 F.2d 790, 792-93 (9th Cir. 1981) (excluding cross-examination of victim on alleged prior false accusation of rape because it amounted to a general credibility attack on the basis

of an unrelated incident and there was no convincing proof that the accusation was false); Ex parte Lloyd, 580 So. 2d 1374, 1376 (Ala. 1991) (holding that defendant could cross-examine victim about admittedly false prior charges and threats regarding sexual crimes because they were relevant to whether the defendant committed sodomy or if the victim was continuing a habit of making false accusations in order to manipulate others); People v. Shepherd, 551 P.2d 210, 212-13 (Colo. Ct. App. 1976) (holding that defendant may cross-examine the victim about a prior false accusation of sexual assault if the defendant can show that the accusation was false); State v. Kelley, 643 A.2d 854, 857 (Conn. 1994) (holding that without evidence that the prior accusation of sexual assault was false, the proposed cross-examination of the victim on the accusation was not relevant); Lawrence v. United States, 482 A.2d 374, 377 (D.C. 1984) (holding that Confrontation Clause compels cross-examination of key prosecution witness about prior false accusations of sexual relations to give jury crucial evidence about the witness's credibility); People v. Alexander, 452 N.E.2d 591, 594 (Ill. App. Ct. 1983) (holding that defendant could not cross-examine the victim about an alleged prior false accusation of rape because his inability to show that the accusation was false rendered it irrelevant); State v. Cox, 468 A.2d 319, 323-24 (Md. Ct. Spec. App. 1983) (holding that the defendant could cross-examine the victim about a prior accusation but that he would be bound by the victim's answer); Commonwealth v. Bohannon, 378 N.E.2d 987, 991 (Mass. 1978) (holding that defendant should have been allowed to cross-examine victim about prior false accusation of rape because it might have damaged the victim's credibility and the defendant proved in an offer of proof that the accusation was false); State v. Caswell, 320 N.W.2d 417, 419 (Minn. 1982) (holding that the defendant should have been allowed to impeach the victim with a prior false accusation but that failure to admit this evidence was harmless beyond a reasonable doubt because of the dissimilarity between the false claim and the current charges and the strength of the state's evidence); State v. Anderson, 686 P.2d 193, 199-200 (Mont. 1984) (holding that although victim can be cross-examined about specific conduct if it goes to her untruthfulness, the fact that the prior accusation of sexual misconduct was dismissed does not mean that it was false); State v. Scott, 828 P.2d 958, 963 (N.M. Ct. App. 1991) (holding that the defendant may cross-examine victim about a prior false accusation of rape in order to impeach the witness but that the trial court properly excluded extrinsic evidence); State v. Baron, 292 S.E.2d 741, 743 (N.C. Ct. App. 1982) (holding that the defendant should have been allowed to impeach the victim by cross-examining her about prior false accusations of nudity and sexual impropriety to encourage the jury to discredit her testimony); State v. Kringstad, 353 N.W.2d 302, 311 (N.D. 1984) (holding that defendant could cross-examine the victim about a prior false accusation of rape against her ex-husband if false but that the unsubstantiated testimony of the ex-husband was not sufficient to prove falsity); State v. Boggs, 588 N.E.2d 813, 816-17 (Ohio 1992) (holding that the defendant may cross-examine the victim about prior false accusations of rape but is bound by the victim's answers); State v. LeClair, 730 P.2d 609, 615 (Or. Ct. App. 1986) (holding that the Confrontation Clause requires that a defendant be allowed to cross-examine a victim about prior false accusations of rape despite Oregon's evidentiary rule prohibiting extrinsic evidence or cross-examination of a witness about specific instances of conduct to attack credibility); State v. Boiter, 396 S.E.2d 364, 365 (S.C. 1990) (holding that a defendant may cross-examine the victim about a prior false accusation of sexual abuse if the trial court determines that the accusation was false, not remote, and similar enough to the current charges to be relevant); State v. Sieler, 397 N.W.2d 89, 92 (S.D. 1986) (holding that the defendant can cross-examine the victim about a prior

accusation of a sexual offense if it was false but that mere denial or arguable falsity of the accusation is not enough); Lopez, 18 S.W.3d at 225 (holding that evidentiary rule barring cross-examination of a witness about specific conduct for the purpose of attacking the witness's credibility excludes cross-examination about prior false accusations unless the probative value of the evidence outweighs the risks of juror confusion); State v. Olson, 508 N.W.2d 616, 620 (Wis. Ct. App. 1993) (holding that a defendant may cross-examine the victim about a prior false accusation of rape but that the Confrontation Clause does not compel the admission of extrinsic evidence); see State v. Schwartzmiller, 685 P.2d 830, 833 (Id. 1984) (holding that evidence of prior false accusation of similar conduct is admissible regarding the victim's credibility but the accusation must be "demonstrably false"); State v. Walton, 715 N.E.2d 824, 827 (Ind. 1999) (creating an exception for demonstrably false prior accusations of rape to Ind. Evid. R. 608(b), which prohibits impeachment of a witness's credibility by inquiry into specific instances of conduct or proof by extrinsic evidence); People v. Lippert, 525 N.Y.S.2d 390, 391 (N.Y. App. Div. 1988) (holding that the trial court did not abuse its discretion in refusing to allow the defendant to cross-examine the victim about prior accusations of rape when no basis for believing those accusations to be false existed); State v. Demos, 619 P.2d 968, 970 (Wash. 1980) (declining to reach issue of whether rape shield statute barred attack on the victim's credibility based upon two arguably false prior rape accusations because the defendant's failure to prove that the evidence was false rendered it irrelevant).

We note that our supreme court has soundly rejected a sex offense exception to rule 404(b) regarding the state's ability to admit evidence of prior crimes or bad acts against the defendant. State v. Rickman, 876 S.W.2d 824, 829 (Tenn. 1994) (holding that the "general rule, which excludes evidence of other crimes or bad acts as irrelevant and prejudicial when the defendant is on trial for a crime or act of the same character remains sound"); State v. Burchfield, 664 S.W.2d 284, 287 (Tenn. 1984). The court stressed that the "general rule excluding evidence of other crimes is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." Rickman, 876 S.W.2d at 828. Thus, evidence of sex crimes and acts by the defendant not charged in the charging instrument, if admissible at all, must be relevant to identity, motive, common scheme or plan, intent or the rebuttal of accident or mistake defenses. Although the evidence in this case goes to the credibility of the victim rather than the defendant, we see no reason to create a per se sex crime exception because the risk of alienating or confusing the jury is the same.

In this respect, the federal courts have held that substantive evidence of a prior false accusation of a sexual offense by the victim of a sexual crime must be relevant to a fact at issue at trial in order to be admissible. United States v. Stamper, 766 F. Supp. 1396, 1401 (W.D.N.C. 1991); aff'd In re One Female Juvenile Victim, 959 F.2d 231 (4th Cir. 1992); see Redmond v. Kingston, Warden, 240 F.3d 590, 593 (7th Cir. 2001). This view comports with our established case law under Rule 404(b), Tenn. R. Evid., which permits evidence of a prior bad act if it is relevant to a fact at issue at trial such as motive, identity, common scheme or plan, intent or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404, Advisory Commission Comment; State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). In Stamper, the court held that evidence of a rape victim's prior false

accusation of rape falls beyond that evidence proscribed by Rule 404(b), Fed. R. Evid., because the defendant is not seeking merely to show the victim's propensity to fabricate the present offense but wants to show the victim's "ulterior motive and plan." 766 F. Supp. at 1401. In that case, the defendant, charged with statutory rape, sought to cross-examine the victim and present extrinsic evidence to prove that in the past, the victim had falsely accused three adult men of sexual abuse in order to move from the home of one biological parent to the other and back again and to achieve other personal goals. The court noted that the "'exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" Id. at 1400 (quoting Davis v. Alaska, 415 U.S. 308, 316-17, 94 S. Ct. 1105, 1110 (1974)). Noting the lack of physical evidence of rape, the court observed that the victim was a crucial or key witness in the state's case against the defendant. Id. Thus, the court held that in "order to confront the complainant effectively, to elucidate the facts and legal issues here in question fully, and to present a defense in a constitutionally viable trial, Defendant must be allowed to set before the jury the proffered evidence of ulterior motives of the complainant." Id. Distinguishing this case from those in which the defendant sought only to impeach the victim's credibility with the prior false accusation, the court held that the defendant "is entitled to offer the evidence necessary to prove his theory of the case by showing that complainant's charges against him did not evince a single isolated instance of manipulative behavior, but rather were part of an ongoing scheme or, at least, a scheme revealed by the like motives and modus operandi of schemes past." Id. at 1402. The court held the evidence admissible under Rule 404(b), Fed. R. Evid. Id. at 1406.

Similarly, in Redmond, the court observed that the probative value of showing a past lie about rape to show that the victim was currently lying was outweighed by the prejudicial effect of telling the jury that the victim "made such a serious charge falsely." 240 F.3d at 593. On the other hand, proving prior false accusations in order to show the victim's motive of getting attention was not prohibited by evidentiary rules preventing proof of specific instances of conduct through extrinsic evidence. Id. Even federal cases discussing a victim's prior false accusation from the perspective of cross-examination rather than substantive evidence have noted that the evidentiary rules exhibit a disdain for the use of specific bad acts to show conforming conduct in the present case. See Boggs v. Collins, 226 F.3d 728, 744 (6th Cir. 2000) (observing that Rules 404(b) and 608(b), Fed. R. Evid., show a disinclination to use prior bad acts to prove conforming conduct); Hughes, 641 F.2d at 793 (noting that the "rules of evidence reflect a general reluctance to draw an inference that because a person may have acted wrongfully on one occasion, he or she also acted wrongfully on the occasion at issue"). Thus, the federal courts have held that the Confrontation Clause does not require that the defendant be allowed to cross-examine the victim about a prior false accusation in order to attack the victim's credibility generally as opposed to revealing the victim's motivations for accusing the defendant in the present case. Boggs, 226 F.3d at 739-40; United States v. Bartlett, 856 F.2d 1071, 1089 (8th Cir. 1988); Hughes, 641 F.2d at 793. Like any other prior wrong or act, a victim's prior false accusation of a sexual offense must relate to a fact at issue at trial in order to be admissible substantively. Otherwise, the relevance of the evidence stems from its tendency to show that the victim has a propensity to lie, a purpose that directly conflicts with Rule 404(b), Tenn. R. Evid.

In the present case, the defendant apparently seeks to fit the evidence into 404(b) by arguing that it reveals the victim's motive to lie about rape. With regard to this basis for admissibility, we note that at trial, the defendant only argued that the prior false accusation related to the victim's credibility:

> We have said all along that this goes to her credibility, whether or not she is lying that this man raped her, that she encountered this man at all. It goes to her credibility. And the jury is going to want to know, why would a woman lie about that. Women don't lie about such things.
>
> We have information that she has told the same lie before to get out of trouble, to keep some–to–when she came in after curfew, and her mother was going to ground her. Well, I was raped. We think the jury needs to know that she responds to coming in like–she was out at four in the morning. We have information that her husband thought that she was at work until midnight.
>
> A lot–this whole case is going to depend on whether this woman is believable or not. And this is a central issue. Would a woman lie about this? This woman did. It goes to her credibility.

The defendant may not argue that evidence is admissible to show a witness's credibility at trial and then add another basis, that the evidence goes to show the witness's motive, on appeal. See State v. Miller, 668 S.W.2d 281, 285 (Tenn. 1984).

Before trial, the defendant did not argue that a basis other than credibility existed for admitting the evidence even when the state argued that the evidence was inadmissible under Rule 404(b), Tenn. R. Evid., because it did not prove anything other than propensity. The defendant contended in his motion for a new trial that the trial court erroneously suppressed evidence of the victim's prior false accusation of rape because that evidence "went to the heart of Ms. Harrison's credibility." Because the defendant did not raise 404(b) as a basis for the admissibility of the evidence at trial, the trial court did not determine whether the evidence was admissible for a purpose other than to show propensity and did not weigh the probative value of the evidence when used for this purpose against the danger of unfair prejudice. See Tenn. R. Evid. 404(b). Other than the fact that the hearing on this matter took place outside the presence of the jury, there was no compliance with the procedural aspects of Rule 404(b). We do not believe that the defendant can now rely on a Rule 404(b) argument. See T.R.A.P. 36(a).

Furthermore, we note that the defendant failed to present clear and convincing proof of the prior false accusation. The defendant presented no proof of the prior false accusation other than his attorney's bare allegation that the victim's family members said that she made this prior false accusation when she was seventeen or eighteen years old. In spite of the state's objection that this evidence violated 404(b) at both pretrial hearings, the defendant did not attempt to have the family members testify about the prior false accusation. Where "there was a hearing outside the presence

of the jury, but the trial court failed to determine and state on the record the material issue to which the evidence was relevant and also failed to find that the probative value of the evidence was not outweighed by the danger of unfair prejudice, the determination of admissibility will be made by the reviewing court on the evidence presented at the jury out hearing." Dubose, 953 S.W.2d at 653. Here, the record is devoid of competent evidence clearly and convincingly showing that the prior false accusation of rape occurred and from which the trial court or this court could conclude that the evidence was admissible under Rule 404(b).

Nevertheless, even looking to the merits of the defendant's argument on appeal, we do not believe he can prevail under Rule 404(b). Before evidence of another crime, act or wrong can be introduced to prove the actor's motive in committing the same or similar act in the present case, the motive must be relevant to prove the act. Neil P. Cohen, et al., Tennessee Law of Evidence § 404[9], at 4-84 (4th ed. 2000). The defendant contends that three years before the present offenses, the victim told family members that she had been raped in order to provide an excuse for returning home after her curfew and to avoid being grounded. He claims that at the time the present offenses allegedly occurred, the victim was angry with her husband because he wanted to smoke marijuana at a friend's house and she wanted him to walk her home. The defendant contends that the victim falsely accused the defendant of raping her in order to make her husband regret that he had not walked home with her that night. The motivations for making the two accusations are not the same. Although it was late when the victim was walking home before the present offenses, her husband knew that she would be out late because he expected to meet her at Weigels. The victim stood to suffer no negative repercussions for being out late, and in fact, her husband did not arrive home until after the rapes had occurred. Instead, the defendant suggests that the victim was motivated by a desire for revenge in making the present accusations rather than by the need for an explanation of her whereabouts or the fear that she would suffer negative consequences for being out late. Thus, the alleged previous false accusation is not relevant to prove the victim's motive to lie in the present case.

This court has recognized that a victim's prior fabrications of crimes can be relevant to show that the victim has the ability to fabricate the crimes at issue. State v. Angela Manning, No. 03C01-9501-CR-00012, Bradley County, slip op. at 17 (Tenn. Crim. App. Feb. 27, 1998); see, e.g., State v. Gookins, 637 A.2d 1255, 1258 (N.J. 1994) (proof that officer falsified breathalyzer tests in other cases is relevant to show that the officer had the opportunity to falsify the test in the present case); People v. Mascarenas, 98 Cal. Rptr. 728, 733-34 (Cal. Ct. App. 1971) (proof that a young prosecution witness had stolen and made false charges to build case against another person is relevant to show that he may have stolen and fabricated charge in present case because it reveals the potential that the current charges are the product of "youthful fantasy or [may] be motivated by malice"). Although a fine distinction, such evidence goes to prove – or rather to disprove – a fact in issue at trial, whether the present offense actually occurred. Such proof is admissible under Rule 404(b), unless its probative value is outweighed by the danger of unfair prejudice.

In Angela Manning, the victim testified that the defendant and two men entered her home, robbed her, and raped her and that the defendant and one of the men burned her with a cigar and a

cigarette. The defendant sought to present evidence that the victim engaged in fraudulent conduct during her marriage to her first husband. At a pretrial hearing, the victim's ex-husband testified that during the time he was married to the victim, he returned home to find a window broken and that the victim told him that their home had been burglarized. The ex-husband testified that the victim had filed an insurance claim for missing items totaling ten to eleven thousand dollars but that he later discovered the missing items in his Winnebago. He also testified that the victim claimed that a man had called threatening to kidnap and kill their daughter if he did not pay fifty thousand dollars. He said that he subsequently received a threatening call and that the caller demanded money and claimed to be serious. The ex-husband said that the FBI determined through voice analysis that the victim was the one making the threatening calls. Finally, he testified that the victim burned herself on her stomach with cigarettes and then sought the navy base police, who subsequently accused him of beating the victim and burning her with cigarettes. The defendant argued that this evidence was admissible under Rule 404(b) because it was relevant to the issue of the defendant's guilt. This court determined that the victim's false report of a burglary to gain insurance proceeds, fabricated kidnapping threats to extract money from her husband, and self-inflicted cigarette burns were probative of her ability to fabricate the crimes for which the defendant was charged. Nevertheless, the factual distinctions between the prior incidents and the offenses at issue in Manning, particularly the lack of injuries in the claimed burglary and the limited nature of the prior cigarette burns, along with the fact that the prior conduct was over seventeen years old, caused this court to hold that the trial court had not abused its discretion in excluding the evidence.

In the present case, the factual distinctions between the alleged previous accusation of rape and the present testimony also limit the probative nature of the evidence. As discussed above, the victim had different motives for the two reports of rape. In fact, other than the timing – both incidents occurred late at night or in the early morning hours – the accounts are dissimilar. In the first incident, the victim allegedly returned home to tell family members that she was taken behind a store and raped. In the present incident, the victim fled the scene of the offense, knocked unsuccessfully on the doors of the nearest lit houses, ran down the road screaming, and stopped a stranger requesting help. Based upon these dissimilarities, we believe that the potential prejudice of the evidence – that the jury would reject the victim's testimony because it believed that she had a propensity to make false allegations of rape – outweighs any probative value it may have.

### C. Impeaching a Witness with Specific Conduct

Specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness. Tenn. R. Evid. 608(b). If the witness denies the conduct, the party proffering the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence. See Tenn. R. Evid. 608(b). Before a witness can be questioned about the specific instance of conduct, the court, upon request, must hold a jury-out hearing "to determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1).

Prior false reports of crime are relevant to a witness's credibility. State v. Walton, 673 S.W.2d 166, 169 (Tenn. Crim. App. 1984) (affirming the state's cross-examination of the defendant about a prior conviction for violation of a city ordinance prohibiting giving false information to the police); see State v. Newsome, 744 S.W.2d 911, 917 (Tenn. Crim. App. 1987) (holding that the victim could be impeached with false reports to police). Similarly with regard to sexual offenses, the fact that a victim previously accused another of raping her is material to her charge of rape against the defendant if proof exists that the victim falsified the prior accusation. See State v. Willis, 735 S.W.2d 818, 822 (Tenn. Crim. App. 1987). In Willis, the defendant, convicted of aggravated rape, wanted to challenge the victim's credibility by showing that she had made false accusations of sexual abuse against another person. In the defendant's offer of proof, a social worker testified that the victim had related that another uncle had also sexually abused her but that this complaint was not investigated because it was vague, the victim's mother thought it was false, and the agency's workload required focus on the defendant's case. This court observed:

> The trial judge refused to admit this evidence because it was irrelevant. The allegation had not been investigated and there was no proof concerning the truthfulness of the other allegation. In the absence of proof that she falsified the other allegation, the fact that she accused another person of committing another sexual offense against her is immaterial. It is entirely possible that the child was abused by more than one person, and this would in no way reflect adversely upon her credibility.

Id. at 822 (emphasis added); see also State v. Charles Ritter, No. 1279, Knox County (Tenn. Crim. App. Feb. 16, 1990), app. denied (Tenn. May 14, 1990) (affirming the trial court's exclusion of the victim's prior sexual abuse by a cousin under the former rape shield statute and noting that prior instances of sexual abuse are immaterial and do not reflect negatively upon a victim's credibility).

However, some factual basis for the prior false report must exist before the party seeking to impeach the witness may ask about it. See Tenn. R. Evid. 608(b)(1). The purpose behind requiring a reasonable factual basis before permitting an inquiry about specific instances of conduct "is to ensure that such questions are proposed in good faith, rather than in an effort to place before the jury unfairly prejudicial information supported only by unreliable rumors." State v. Nesbit, 978 S.W.2d 872, 882 (Tenn. 1998) (discussing the identical requirement under Rule 405(a)(1)-(2) that the trial court, upon request, hold a jury-out hearing to assess the existence of a reasonable factual basis for an inquiry about a specific instance of conduct). To the extent possible, the party seeking to introduce the evidence should present extrinsic proof of the specific instance of conduct at the jury-out hearing. Id. "If the realities of trial make it impossible to do so, the attorney proposing to ask the question should, at a minimum, clearly state on the record the source and origin of the information underlying the specific instance of conduct about which the inquiry is proposed." Id.

In Nesbit, the prosecutor solicited from the witness that the defendant's aunt told him that the defendant allegedly engaged in satanic worship. The prosecutor stated that two or three people had told him that the victim told them that the defendant said that he practiced satanic worship. The

prosecutor said that the victim's family related the allegations of satanic worship to the defendant's aunt after the murder. The court held that this established a reasonable factual basis by identifying on the record that the victim was the source and origin of the specific instances of conduct. Id. at 884-85.

In State v. William B. Thurbley, the state sought to ask defense witnesses who testified about the defendant's reputation for peacefulness if they had heard that the defendant had assaulted his ex-wife. No. 03C01-9709-CC-00414, Sevier County (May 11, 1999), app. granted (Tenn. Dec. 13, 1999) (granting permission to appeal for the sole purpose of remanding the case to the trial court for correction of the record). In a jury-out hearing, the assistant district attorney stated that he had a factual basis for the inquiry and offered to have the ex-wife testify about the assaults. This court held that the state's assertion that it had information from the ex-wife about the two assaults by the defendant gave a sufficient factual basis for the inquiry. Id. at 24.

In the present case, we question whether defense counsel's assertions regarding the prior false accusation provide an adequate factual basis to permit the defendant to cross-examine the victim about this specific bad act. Defense counsel stated that she had information from "several sources" regarding the prior false accusation and that the victim's family members said that she made this prior false accusation when she was seventeen or eighteen years old. Although we deduce that the sources from which the information stems are family members of the victim, we do not know if these are the family members to whom the victim made the alleged false accusation or if these family members learned of the accusation from others. This situation is distinct from that in Thurbley where the prosecutor pointed to a specific person who had first-hand knowledge of the specific instances of conduct. Nevertheless, this situation is not dramatically different from that in Nesbit, in which the prosecutor stated that several people had told him that the victim said the defendant told her that he engaged in satanic worship.

In the present case, defense counsel stated that the victim's family members related that the victim claimed she had been raped and then recanted the accusation just before the police were called. The victim's recanting of her accusation of rape indicates that it was false. As discussed above, a victim's prior false accusation of crime is probative of the witness's character for truthfulness or untruthfulness. The false accusation allegedly occurred when the victim was seventeen or eighteen years old, and the victim was twenty-three years old at the time of trial. Thus, the accusation falls within the ten-year limitation set out in Rule 608(b)(2). Under these circumstances, the probative value of the evidence is not substantially outweighed by its prejudicial effect. See Tenn. R. Evid. 403.

The fact that the victim could have been a juvenile at the time of the accusation also bears upon its admissibility:

Evidence of specific instances of conduct a witness committed while the witness was a juvenile is generally inadmissible under this rule. The court may, however, allow evidence of such conduct of a witness other than the accused in a criminal case if the

conduct would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination in a civil or criminal proceeding.

Tenn. R. Evid. 608(c). Here, the conduct would be admissible to attack the credibility of an adult. Thus, the question is whether the evidence is necessary for a fair determination of the defendant's guilt. In the present case, although the victim's emotional reaction following the offenses corroborates her testimony that she was raped, the victim's testimony provides the only evidence linking the defendant to the crime. The investigation did not uncover the victim's fingerprints in the defendant's car or semen on the passenger's seat. Although semen was found in the victim's vaginal swab and on her shorts, the sample did not yield a DNA profile. Agent Kelly Smith testified that one possible explanation for this was the fact that semen degrades over time. The victim reported to the emergency room staff that she last had sexual intercourse two days before the present offenses. Through cross-examination of the victim, the defendant established that the victim had an opportunity to see the defendant and to connect him with the car bearing the license plate number UDA-240. This evidence reveals that the admissibility of the prior false accusation was necessary for a fair determination of the case even if the victim was seventeen at the time she made the accusation. Thus, the defendant should have been permitted to cross-examine the victim about the prior false accusation of rape.

The defendant contends that his inability to impeach the victim's credibility with her prior false accusation of rape violates his rights under the Confrontation Clause. As discussed above, the defendant's fundamental right to confront the witnesses against him includes his right to meaningful cross-examination of those witnesses. Ritchie, 480 U.S. 51, 107 S. Ct. at 998; Brown, 29 S.W.3d at 431. Cross-examination tests not only the witness's perception and recollection of the account given but also the witness's credibility. Davis, 415 U.S. at 316, 94 S. Ct. at 1110. The attack on a witness's credibility may be a general attack designed "to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony" or a particular attack that reveals "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." Id.

In Davis, the defendant sought to cross-examine the juvenile witness, who testified that he saw the defendant in the area where the police found the stolen safe, with his juvenile adjudication of delinquency for burglary in order to show that the witness identified the defendant in order to shift police suspicion away from himself. An Alaska statute prohibited the introduction of a juvenile's record, and the trial court restricted cross-examination. Noting that the juvenile witness's truthful testimony was a key element in Alaska's case against the defendant, the United States Supreme Court held that the exclusion of cross-examination of the witness in order to show bias and prejudice was error that affected the defendant's constitutional rights. Id. at 317, 320, 94 S. Ct. at 1111-12. Further emphasizing the distinction between general and particular credibility attacks, Justice Stewart wrote in his concurring opinion:

The Court holds that, in the circumstances of this case, the Sixth and Fourteenth Amendments conferred the right to cross-examine a particular prosecution witness about his delinquency adjudication for burglary and his status as a probationer. Such cross-examination was necessary in this case in order "to show the existence of possible bias and prejudice . . .," ante, at 1111. In joining the Court's opinion, I would emphasize that the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions.

Id. at 321, 94 S. Ct. at 1112-13 (Stewart, J., concurring). Thus, not every denial of the right to cross-examine a witness in order to impeach his or her credibility rises to the level of constitutional error.

In Boggs v. Collins, the Sixth Circuit examined whether the trial court's refusal to allow the defendant to cross-examine the rape victim about an alleged prior false accusation of rape violated the defendant's rights under the Confrontation Clause. 226 F.3d 728, 736 (6th Cir. 2000). The court noted the distinction that the Supreme Court made in Davis between general and particular attacks upon a witness's credibility and held that in cases involving a prior false accusation of rape, cross-examination is "constitutionally compelled when it reveals witness bias or prejudice, but not when it is aimed solely to diminish a witness's general credibility." Id. at 737; see also Bartlett, 856 F.2d at 1089 (holding that the trial court's exclusion of cross-examination on a prior false accusation of rape did not violate the defendant's Sixth Amendment rights because the defendant sought to attack the victim's credibility generally); Hughes, 641 F.2d at 793 (holding that the limitation on cross-examination regarding the victim's alleged prior false accusation of rape did not violate the Confrontation Clause because the defendant sought to make a general attack on the victim's credibility); Olson, 508 N.W.2d at 620 (holding that the Confrontation Clause did not compel the admission of extrinsic evidence of a prior false accusation of rape especially when the credibility attack was not "aimed toward revealing possible biases, prejudices or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand"). On the other hand, several jurisdictions have reached the general conclusion that the Confrontation Clause compels the cross-examination of the victim about a prior false accusation of rape without discussing whether the false accusation represented a general or a particular attack on the victim's credibility. See State v. Walton, 715 N.E.2d 824, 827 (Ind. 1999) (reasoning that the Indiana "evidentiary rule preventing evidence of specific acts of untruthfulness must yield to the defendant's Sixth Amendment right of confrontation"); State v. Barber, 766 P.2d 1288, 1290 (Kan. Ct. App. 1989) (citing Davis and holding that the Confrontation Clause permits the creation of a special exception to the evidentiary rule barring admission of a witness's specific conduct that tends to prove a character trait); State v. Caswell, 320 N.W.2d 417, 419-20 (Minn. 1982) (holding that the refusal to allow the defendant to impeach the victim with a prior false accusation of rape was harmless beyond a reasonable doubt due to the strength of the state's evidence and the dissimilarity of the two accusations); State v. LeClair, 730 P.2d 609, 615 (Or. Ct. App. 1986) (holding that the Confrontation Clause requires that the defendant be allowed to cross-examine the victim about a prior false accusation if the risk of prejudice, confusion, embarrassment, or delay does not substantially outweigh the probative value

of the evidence); Clinebell v. Commonwealth, 368 S.E.2d 263, 266 (Va. 1988) (holding that "in the context of prosecutions of sexual offenses, evidentiary constraints must sometimes yield to a defendant's right of cross-examination" guaranteed by the Sixth Amendment); see also Lawrence v. United States, 482 A.2d 374, 377 (D.C. 1984) (reversing because the Confrontation Clause compels cross-examination of key prosecution witness about prior false accusations of sexual relations to give jury crucial evidence about the witness's credibility). These cases fail to account for the limitations in Davis. See Denise R. Johnson, Prior False Allegations of Rape: Falsus in Uno, Falsus in Omnibus, 7 Yale J.L. & Feminism 243, 262 (1995) (reasoning that courts have mistakenly held the Confrontation Clause to require evidence of prior false accusations of sexual assault by classifying the evidence as relating to the victim's credibility without distinguishing between general and particular credibility attacks under Davis). Our supreme court has observed the limitations in Davis in holding that no confrontation issue resulted from a protective order preventing the defendant from impeaching juvenile witnesses with prior juvenile convictions in order to attack the witnesses' credibility generally rather than to show the witnesses' bias or prejudice. State v. Butler, 626 S.W.2d 6, 10 (Tenn. 1981).

In Boggs, the defendant argued that he wanted to cross-examine the victim about the prior accusation in order to show that if she lied once about being raped, she would do it again. The court concluded that the defendant sought to attack the victim's credibility generally, therefore, the Confrontation Clause was not violated:

> No matter how central an accuser's credibility is to a case – indeed, her credibility will almost always be the cornerstone of a rape or sexual assault case, even if there is physical evidence – the Constitution does not require that a defendant be given an opportunity to wage a general attack on credibility by pointing to individual instances of past conduct.

226 F.3d at 739-40 (emphasis in original). The court noted that the magistrate had reasoned that the excluded cross-examination went to the victim's motives in accusing the defendant of rape but that neither the magistrate nor the defendant had given a motive that would have been revealed by the prior accusation. Id. at 740. The court held that "labeling this general credibility argument to be one of 'motive' without articulating a theory of motive or partiality does not implicate the rights carefully outlined in Davis." Id. at 741 (footnote omitted).

In the present case, the defendant seeks to cross-examine the victim in order to make a general attack upon her credibility. Although the defendant argues that the victim's prior false accusation also reveals her motive to lie in this case, as discussed above, the motives behind the two accusations are distinct. Thus, the defendant's rights under the Confrontation Clause were not violated by his inability to make a general attack upon the victim's credibility by cross-examining her about her prior false accusation of rape.

Nevertheless, this case is strikingly similar to State v. Dishman, 915 S.W.2d 458 (Tenn. Crim. App. 1995), in which this court held that the circumstances compelled that the defendant be

allowed full and complete cross-examination of the rape victim. In Dishman, the trial court prohibited the defendant, convicted of aggravated rape and kidnapping, from impeaching the victim with specific conduct. The defendant sought to cross-examine the victim about her participation in a burglary for which the victim had successfully completed pretrial diversion. This court held that although the victim's burglary charges were eventually dismissed, the defendant could impeach the victim with this specific conduct under Rule 608(b). Id. at 463. In discussing the harmful effect of this error, we observed that

> the convictions for kidnapping and rape depended almost entirely upon the truthfulness of the victim's testimony, much of which was uncorroborated. Because the credibility of the victim was a central issue, the victim's previous participation in a crime involving dishonesty was especially probative. The evidence, if admitted, may have changed the results of the trial. The importance of a full and complete cross-examination, under these circumstances, is so fundamental as to preclude a finding of harmless error

.
Id. at 464. Given the circumstances in this case, we believe Dishman provides protection for cross-examination under the defendant's right to due process. In this regard, under the circumstances existing in the present case, we conclude under Dishman that the defendant's ability to conduct a full and complete cross-examination was so important that due process prevents the failure to allow the cross-examination from being considered harmless beyond a reasonable doubt.

## V. PRIOR INCONSISTENT STATEMENTS

The defendant contends that the trial court erroneously ruled that he could not present extrinsic evidence of the victim's prior inconsistent statements regarding whether she was on her way to or from work at the time of the offenses, what time she left Labor World, where she first encountered the defendant, and whether she fought with the defendant during the rapes. He argues that this evidence was crucial to his defense that the victim was not credible. He maintains that although the trial court subsequently reversed this ruling just before he presented his last witness, his inability to present extrinsic evidence through the victim's husband and sister violated his rights to due process and equal protection of law. He also claims that the trial court erroneously excluded Mike Cohan's written reports and audiotape recordings of the victim's prior inconsistent statements. He contends that if the trial court had allowed him to impeach the victim's testimony with this extrinsic evidence, it is probable that the jury would not have found him guilty of the offenses. The state contends that the trial court cured any mistaken evidentiary ruling by allowing the defendant to prove the prior inconsistent statements through the testimony of Mike Cohan, the defendant's investigator. It contends that the defendant has not shown that any prior inconsistent statements, other than those proven through Mr. Cohan, exist.

Initially, we note that the defendant failed to raise this issue in his motion for a new trial. In the motion, the defendant challenged only the exclusion of the audiotapes of conversations between the state's witnesses and his private investigator upon the basis that the defendant had

-32-

violated the reciprocal discovery requirements of Rule 16, Tenn. R. Crim. P.  If a defendant fails to raise an issue alleging error in the exclusion of evidence in the motion for new trial, the defendant waives appellate review of that issue.  T.R.A.P. 3(e).  Thus, we examine this issue only for the presence of plain error which must be corrected in order to render substantial justice.  See Tenn. R. Crim. P. 52(b).

On direct examination, the victim testified that she called her husband from Labor World between 12:00 and 1:00 a.m., waited for him for about forty-five minutes, and then began walking home from work alone.  She said that the defendant drove past her twice, then stopped as she was walking on Fifth Avenue just before a bridge near the Knoxville Utility Board building.  On cross-examination, the victim denied calling her husband at 11:00 p.m.  She stated that she did not know what time she left Labor World.  She stated that she did not recall telling Mike Cohan that she first saw the defendant's car in front of a card shop on North Fifth Avenue.  When questioned about her failure to tell Detective Clowers that she jumped over a fence while fleeing the defendant's car, the victim stated that she did not tell Detective Clowers a number of things because she was fighting with her husband at the time.  She admitted that she did not tell Mr. Cohan that she jumped over a fence but stated that she did not go into the details of the rape with him. She stated that she did not recall telling Mr. Cohan that she pounded on the defendant's back.

Before the defendant began his proof and with the jury out, the state moved the court to direct the defendant to follow Rule 608, Tenn. R. Evid.,[2] which it characterized as prohibiting extrinsic evidence of specific instances of conduct.  The defendant argued that he was entitled to bring out the victim's prior inconsistent statements through the testimony of his investigator.  The court ruled that Rule 608(b) prevented such testimony and declined to hear any further argument on the issue.

Before the defendant called his last witness, Mike Cohan, and with the jury out, the defendant asked the court about its earlier ruling that he could not introduce the audiotapes of the victim's conversations with Mr. Cohan.  At this time, the court ruled that Mr. Cohan could testify about prior inconsistent statements the victim made to him. The state argued that the defendant could not introduce the audiotapes of Mr. Cohan's conversations with the victim and other witnesses because the defendant had not provided the audiotapes to the state when it moved for reciprocal discovery pretrial.  The defendant argued that the state was aware that the audio taped conversation with the victim existed because defense counsel had questioned the victim about it on cross-examination. He contended that the audio taped conversations with John Harrison and Anonda Joiner were Jencks material to which the state was not entitled unless it requested them following the witness's

---

[2]Rule 608(b), Tenn R. Evid., provides in pertinent part:

Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character of the witness being cross-examined has testified.

testimony. Defense counsel added "if the Court is ruling that we cannot introduce the tapes, as long as Mr. Cohan can testify as to what these people told him that are prior inconsistent statements to what they're telling–they're saying now, that's fine. We won't introduce the tapes." The state responded that it did not dispute the defendant's right to prove prior inconsistent statements through Mr. Cohan's testimony but asked the court to instruct the jury that the defendant's impeachment of his own witnesses was not substantive proof. The court agreed to give the instruction.

Mike Cohan testified that he interviewed the victim while investigating the case for the defendant. He said that the victim told him that on the evening of the offenses, she had gone to Labor World but felt ill and did not work that evening. He said that she told him she called her husband at 11:00 p.m. He said that the victim said she first saw the defendant when she was on Fifth Avenue in the area of Knoxville Business College and a little flower shop. Based upon his own familiarity with the area, Mr. Cohan stated that Knoxville Business College was on North Fifth Avenue, which intersects with East Fifth Avenue, and that the flower shop was on East Fifth Avenue. Mr. Cohan said that in describing what happened, the victim never mentioned jumping over any fences. He said that she told him that she hit the defendant on the back during the rape. He said that although the victim expressed fear of the defendant who had a knife, she did remark that she was able to take care of herself. He said that he spoke with the victim's husband, John David Harrison, who told him that the victim said she would be working until 10:00 or 11:00 p.m. on the evening before the offenses and that she called her husband at midnight that night. He said that he interviewed Anonda Joiner, who told him that the victim cried easily. Ms. Joiner told him that the victim's reaction to the offenses was unusually flat and that on one occasion, the victim seemed to think that the whole incident was funny. Following Mr. Cohan's testimony, the trial court instructed the jury that the out-of-court statements were admitted for the purpose of testing the witness's credibility and that the statements themselves were not proof.

A party may prove a witness's prior inconsistent statement by extrinsic evidence if the party gives the witness an opportunity to explain or deny the prior inconsistent statement and the opposing party has the chance to question the witness about the matter or if "the interests of justice otherwise require." Tenn. R. Evid. 613(b). Although initially the trial court erroneously ruled that the defendant could not prove the victim's prior inconsistent statements through the testimony of Mike Cohan, the court reversed this ruling before Mr. Cohan testified, and the defendant questioned Mr. Cohan about what the victim told him.

On appeal, the defendant contends that the trial court erroneously prevented him from presenting extrinsic evidence of the victim's prior inconsistent statements through the testimony of John David Harrison and Anonda Joiner. Nothing in the record indicates that the defendant intended to use these witnesses to present extrinsic proof of prior inconsistent statements by the victim at trial. The defendant did not question the victim about whether she made inconsistent statements to Mr. Harrison or Ms. Joiner thereby giving her an opportunity to explain or deny the statements as required by Rule 613. See State v. Martin, 964 S.W.2d 564, 567-68 (Tenn. 1998) (holding that the witness must be afforded an opportunity to explain or deny the prior inconsistent statement or extrinsic evidence of the statement is inadmissible). On the other hand, the defendant asked both

Mr. Harrison and Ms. Joiner about prior statements they made to Mr. Cohan. The defendant then presented extrinsic proof through Mr. Cohan about statements made by Mr. Harrison and Ms. Joiner. We note that the defendant was not entitled to present this extrinsic proof with regard to Ms. Joiner because on direct examination, Ms. Joiner admitted that she told Mr. Cohan that the victim did not seem upset when discussing the case and that her demeanor was unusual considering her emotional nature. See id. at 567 (observing that if a witness admits making the prior inconsistent statement, then the statement may not be proven through extrinsic evidence). Thus, the defendant's questioning of the victim, Mr. Harrison, Ms. Joiner, and Mr. Cohan is consistent with his argument at trial, urging the court to allow him to use Mr. Cohan to present extrinsic evidence of prior inconsistent statements of the victim and the other two witnesses.

The defendant may not argue to present extrinsic evidence through a single witness at trial and then, once the trial court has allowed the extrinsic proof, fault the trial court on appeal for not permitting him to present extrinsic evidence through different witnesses. See State v. Miller, 668 S.W.2d 281, 285 (Tenn. 1984). The trial court had no opportunity to extend its new ruling regarding the admissibility of extrinsic proof to Mr. Harrison or Ms. Joiner. Furthermore, the defendant made no proffer of what these witnesses would have said that the victim told them. Finally, even if the defendant had intended to have Mr. Harrison or Ms. Joiner testify about prior inconsistent statements made by the victim, the extrinsic proof would have been inadmissible because as discussed above, the defendant failed to comply with the requirements of Rule 613. See id. at 567-68. The trial court cured its initial error in excluding extrinsic evidence by permitting Mr. Cohan to testify about the victim's prior inconsistent statements.

The defendant also contends that the trial court should have admitted Mr. Cohan's reports and audiotapes of his conversations with the victim but provides no support for this contention other than arguing that the audiotapes and reports constitute "valuable evidence" of the victim's prior inconsistent statements. The trial court granted the state's pretrial motion that the defendant not be allowed to introduce documents or tangible evidence because he failed to provide reciprocal discovery as required by Rule 16(b), Tenn. R. Crim. P. However, the requirement that the defendant provide reciprocal discovery does not extend to "reports, memoranda, or other internal defense documents made by the . . . defendant's . . . agents in connection with the investigation or defense of the case" or to statements made by witnesses for the state or the defense to the defendant's agents. Tenn. R. Crim. P. 16(b)(2). Here, the defendant included neither the reports nor the audiotapes in the record on appeal. A defense investigator's report of an interview with the victim constitutes work product, which is excluded from reciprocal discovery by Rule 16(b)(2). The audiotapes purportedly contain statements by the victim, a witness for the state, to the defendant's agent, his private investigator. As such, they are also excluded from reciprocal discovery by Rule 16(b)(2). Nevertheless, the defendant questioned Mr. Cohan in detail about his interview of the victim. Thus, the exclusion of the audiotapes and reports was at most harmless error. See Tenn. R. Crim. P. 52(a). The fact that the defendant agreed to present Mr. Cohan's testimony in lieu of the audiotapes without noting further exception only strengthens our belief that plain error does not exist.

## VI. DISCOVERY OF SEXUAL ASSAULT CRISIS CENTER RECORDS

The defendant contends that he was entitled to discover the contents of the victim's file from the Sexual Assault Crisis Center (SACC) because it contained exculpatory evidence. He argues that the trial court erred in determining that the contents of the file were not exculpatory in its in camera review because it did not compare the victim's statements in the file with other statements that she made about the rapes. He also maintains that because only he knew what other statements by the victim the defense investigation had revealed, the trial court could not have determined whether the statements in the file were exculpatory. The state contends that when the defendant asked the trial court to review the file, he failed to tell the court what information he thought should or could be material. It argues that the defendant did not have the right to examine all of the confidential information on the chance that it might contain inconsistent statements. Finally, it maintains that the defendant has failed to show that he was prejudiced by his inability to look through the file.

The defendant appeared for trial on June 1, 1999, and informed the court that the SACC had refused to respond to a subpoena to bring the victim's records to court. Upon the defendant's oral motion, the trial court ordered the SACC to deliver to the court for an in camera review all notes reports, medical records or other information relating to the victim. It examined the records for exculpatory material and, on June 22, 1999, determined that the records contained none. The trial court sealed the records for appellate review.

Initially, we observe that neither party has stated why the defendant is or is not entitled to the SACC file or if the contents of the file are privileged. Nothing, including the contents of the file itself, indicates whether the SACC is a state agency. See, e.g. State v. Carter, 682 S.W.2d 224, 226 (Tenn. Crim. App. 1984) (holding that Rule 16, Tenn. R. Crim. P., did not entitle the defendant to discover records of a psychologist whom the victim consulted two months following the aggravated rape because these records were not in the possession, control, or custody of the state). Nor does the record reflect whether a psychologist, a psychiatrist, or a certified social worker compiled the file. See Tenn. Code Ann. §§ 24-1-207 (communications between a patient and psychiatrist in the course of a therapeutic counseling relationship are privileged), 63-11-213 (confidential communications between a client and a psychologist are privileged to the same extent as attorney-client communications), 63-23-107 (confidential communications between a client and a certified social worker are privileged to the same extent as communications with psychologists and psychiatrists).

In any event, our review of the SACC file uncovered only one statement that conflicted with any of the victim's statements about the rapes. The file reveals that on the day of the offenses, the victim stated that at the time of the attack, she was returning from reporting to work to say that she could not work. On direct examination, the victim testified that she was walking home from work when the offenses occurred. Detective Clowers testified that the victim told him that on the night of the offenses, she was suppose to work at Labor World but became ill and decided to walk home. John David Harrison testified that the victim called him when she finished work, said she was feeling ill, and wanted him to meet her. Mike Cohan testified that the victim told him that she had gone to Labor World but left because she felt ill. Stan Bunch, the manager at Labor World, testified

that the victim was probably scheduled to work at midnight on the 26th but that no record existed to show that she was sent from Labor World to the Coliseum at that time. Thus, the issue of whether the victim was at work before she began walking home on the night in question was thoroughly examined at trial. The defendant suffered no harm from his inability to review the victim's SACC file.

## VII. CONSTITUTIONALITY OF TENN. CODE ANN. § 40-35-120

The defendant challenges the life sentences imposed by the trial court, arguing that the repeat violent offender statute, Tenn. Code Ann. § 40-35-120, is unconstitutional because its caption embraces more than one subject. He also claims that the statute violates his equal protection rights by depriving him of the opportunity to present mitigating evidence for the trial court's consideration in regard to his sentence. He maintains that the statute is effectively an ex post facto law and violates his due process rights because it inflicts a greater punishment upon him based upon an element that was satisfied prior to the statute's enactment. The state contends that the statute comports with the requirements of the United States and Tennessee Constitutions.

In 1987, the defendant plead guilty to rape and received a thirteen-year sentence. On June 30, 1999, the jury convicted the defendant of the present offenses, two counts of aggravated rape. Section 40-35-120(a)(5)-(6) provides that a "'repeat violent offender' is a defendant who . . . [i]s convicted in this state on or after July 1, 1995, of any offense classified in subdivision (d)(1) as a violent offense; and . . . [h]as at least one (1) prior conviction for an offense classified in subdivision (d)(1) or (d)(2) . . . ." Subdivision (d)(1) lists rape and aggravated rape as violent offenses. Tenn. Code Ann. § 40-35-120(d)(1)(E), (I). Thus, the defendant qualifies as a repeat violent offender under the statute because his 1987 conviction for rape and the present convictions for aggravated rape are violent offenses. Although, as the state correctly notes, the defendant has convictions for three violent crimes, he does not qualify for repeat violent offender status under the portions of the statute requiring two prior convictions in addition to the present conviction(s) because a prior conviction entails serving and being released from a period of incarceration. Tenn. Code Ann. § 40-35-120(e)(1). The defendant has served only one period of incarceration, that imposed for the 1987 rape conviction, even though he has committed three violent offenses.

The defendant contends that section 40-35-120 is unconstitutional under article II, section 17, of the Tennessee Constitution because its caption – "Repeat violent offenders – 'Three strikes'" – embraces those designated as repeat violent offenders after receiving three convictions and those given that status after two convictions. He argues that following the 1995 amendments to the statute, which added the provisions extending the statute to those defendants with two convictions, the body of the act became broader than its caption. Noting that the purpose of article II, section 17 is to prevent surprise and fraud, the defendant contends that the "Three Strikes statute" failed to inform him that a second conviction for a violent offense would result in a sentence of life without parole. The state argues that if a caption is restricted to a certain subject, the body of the act must be relevant to the restrictive portion of the caption. It notes that subsections (1) and (2) confer repeat violent offender status based upon convictions for three violent offenses and that subsections (3) through

(6) give that status to defendants with convictions for two violent offenses. Thus, it contends that a portion of the body of the statute relates to the "Three strikes" in the caption.

"No bill shall become law which embraces more than one subject, that subject to be expressed in the title." Tenn. Const. art. II, § 17. The purpose of this constitutional provision is to prevent "'omnibus bills' and bills containing hidden provisions of which legislators and other interested persons might not have appropriate or fair notice." State ex rel. Blanton v. Durham, 526 S.W.2d 109, 111 (Tenn. 1975) (citations omitted); see Tennessee Mun. League v. Thompson, 958 S.W.2d 333, 336 (Tenn. 1977). However, the subsequent codification of the bill cures any defects in the caption. State v. Chastain, 871 S.W.2d 661, 666 (Tenn. 1994); Howard v. State, 569 S.W.2d 861, 863 (Tenn. Crim. App. 1978). The 1995 amendments to section 40-35-120 added the subdivisions that apply to the defendant. See 1995 Tenn. Pub. Acts, ch. 499, §§ 1-2. These amendments were codified in section 40-35-120 and became effective July 1, 1995. If any defect in the caption existed, it was cured by this codification.

Next, the defendant contends that the repeat violent offender statute deprives him of the equal protection of law because it prevents the trial court from considering any mitigating factors in setting his sentence. He argues that defendants not classified as repeat violent offenders, including those facing the death penalty or life imprisonment without parole, have the opportunity to present mitigating factors, which could possibly reduce the sentence imposed. See Tenn. Code Ann. §§ 39-13-204(j), 40-35-113. The state does not respond to this argument.

Equal protection of the law requires that the state treat persons under like circumstances and conditions the same. Genesco, Inc. v. Woods, 578 S.W.2d 639, 641 (Tenn. 1979), superseded on other grounds by Combustion Eng'g, Inc. v. Jackson, 705 S.W.2d 655 (Tenn. 1986). For this reason, "[r]ecidivist statutes do not violate either the equal protection or the due process provisions of the State and Federal Constitutions." State v. Yarbro, 618 S.W.2d 521, 525 (Tenn. Crim. App. 1981) (evaluating enhanced punishment for a second offense of possession of a controlled substance); see also Glasscock v. State, 570 S.W.2d 354, 355 (Tenn. Crim. App. 1978) (observing that the law is well-settled that the Habitual Criminal Statute does not violate equal protection or due process); Moore v. State, 563 S.W.2d 215, 218 (Tenn. Crim. App. 1977) (holding that the enhancement of the defendant's "present punishment . . . because of his status as an habitual criminal violates no constitutional provision, State or Federal"). In State v. Taylor, this court held that the Class X Felonies Act of 1979 did not violate equal protection because the Act treated all defendants under like circumstances and conditions alike. 628 S.W.2d 42, 47 (Tenn. Crim. App. 1981). The Class X Felonies Act listed eleven felonies that were dangerous to human life and provided that these felonies were "determinate in nature, not subject to reduction for good, honor or incentive or other sentence credit of any sort, . . . terminate only after service of the entire sentence, and shall not be subject to pretrial diversion." Id. (citing Tenn. Code Ann. § 39-5403 (repealed 1989)). Similarly, the repeat violent offender statute treats defendants who have committed either two or three of certain specified violent offenses alike in that it imposes a sentence of life without parole for all qualifying defendants. See Tenn. Code Ann. § 40-35-120(g). Repeat violent offenders are under different circumstances than defendants who have not committed at least two violent offenses.

Therefore, the equal protection of the law does not require that these two categories of offenders be treated alike.

"Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." Baxstrom v. Herold, 383 U.S. 107, 113, 86 S. Ct. 760, 763 (1966). In the absence of a suspect classification, such as race, or of an intrusion upon a fundamental constitutional right, the challenged classification must "bear some rational relationship to legitimate state purposes." San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 40, 93 S. Ct. 1278, 1300 (1973). The purpose of the sentencing statutes is to promote justice. Tenn. Code Ann. § 40-35-102. Among the sentencing principles designed to promote that purpose are the principles of preventing crime and promoting respect for the law by providing a deterrent to those likely to violate the law and incarcerating defendants who commit the most severe offenses. Tenn. Code Ann. § 40-35-102(3)(A), (5). Furthermore, the legislature has a legitimate interest in protecting citizens from crime as a part of the state's police power. Motlow v. State, 125 Tenn. 547, 566, 145 S.W. 177, 183 (1912). The legislature's decision to impose the very severe sentence of life imprisonment without possibility of parol upon those criminals who repeatedly commit violent offenses is rationally related to its desire to protect the public and deter crime. See Taylor, 628 S.W.2d at 74 (holding that the "distinction between Class X crimes and other crimes is rational and reasonable"); see also State v. Dee W. Thompson, No. 01C01-9812-CR-00490, Davidson County, slip op. at 25 (Tenn. Crim. App. Mar. 17, 2000) (noting that the repeat violent offenders statute is "similar in purpose and effect" to the former Class X Felony Act of 1979). Thus, the repeat violent offender statute does not violate the defendant's right to equal protection of the law.

We note that the defendant makes no argument that the legislature lacked a rational basis for extending jury determination of recidivism to some classes of defendants but not to violent offenders. See Tenn. Code Ann. § 40-35-203(e).[3] In the absence of argument of the parties and development in the record, we decline to address this issue. See T.R.A.P. 13(b) (providing that review "generally will extend only to those issues presented for review").

Finally, the defendant contends that the repeat violent offender statute violates his protection against ex post facto application of law and his due process rights because when he pled guilty to rape in 1987, he was not aware that his 1987 conviction would later expose him to a life sentence. Our Supreme Court has delineated five categories of ex post facto laws:

---

[3]Tenn. Code Ann. section 40-35-203(e) provides:

If the criminal offense for which the defendant is charged carries an enhanced punishment for a second or subsequent violation of the same offense, the indictment in a separate count shall specify and charge such fact. If the defendant is convicted of the offense, then the jury must find that beyond a reasonable doubt the defendant has been previously convicted the requisite number of times for the same offense. Upon such finding, the defendant shall be subject to the authorized terms of imprisonment for the felonies and misdemeanors as set forth in § 40-35-111.

1. A law which provides for the infliction of punishment upon a person for an act done which, when it was committed, was innocent.

2. A law which aggravates a crime or makes it greater than when it was committed.

3. A law that changes the punishment or inflicts a greater punishment than the law annexed to the crime when it was committed.

4. A law that changes the rules of evidence and receives (sic) less or different testimony than was required at the time of the commission of the offense in order to convict the offender.

5. Every law which, in relation to the offense or its consequences, alters the situation of a person to his disadvantage.

State v. Pearson, 858 S.W.2d 879, 882 (Tenn. 1993) (alteration in original) (quoting Miller v. State, 584 S.W.2d 758, 761 (Tenn. 1979)).

Applying these categories to the defendant's 1987 rape conviction, the 1987 rape was not an innocent act when committed. Furthermore, the repeat violent offender statute neither aggravates the 1987 rape nor attaches a greater punishment to that crime than the one attached when it was committed. The defendant's challenge does not implicate the rules of evidence in effect at the time of the 1987 conviction. Thus, we must decide whether the repeat violent offender statute disadvantages the defendant in relation to the 1987 rape or its consequences.

Penalty "enhancing statutes only enhance the sentence for the triggering offense, rather than punish prior acts." State v. Johnson, 970 S.W.2d 500, 505 (Tenn. Crim. App. 1996) (holding that the multiple rapist statute does not operate to increase punishment for a prior offense ex post facto but instead only enhances the punishment for the triggering offense). Although the repeat violent offender statute looks to prior violent offenses – here the 1987 rape conviction – to determine whether a defendant qualifies as a repeat violent offender, it is the triggering offense – here the two aggravated rape convictions – for which the life sentence is imposed. See Tenn. Code. Ann. § 40-35-120(g) (providing that the "court shall sentence a defendant who has been convicted of any offense listed in subdivision (b)(1), (c)(1), or (d)(1) to imprisonment for life without possibility of parole if the court finds beyond a reasonable doubt that the defendant is a repeat violent offender as defined in subsection (a)"). In other words, the statute disadvantages the defendant in relation to his present offenses rather than his 1987 conviction. Because the repeat violent offender statute was in effect before the defendant committed the present offenses, no ex post facto problem arises.

The same reasoning applies to the defendant's due process argument. The defendant summarily contends that the repeat violent offender act violates his right to due process because he did not know at the time he pled guilty to rape in 1987 that this conviction could later be used to qualify him for repeat violent offender status. The portions of the repeat violent offender statute that

apply to the defendant became effective on July 1, 1995. At that point, the defendant was presumed to be on notice that any subsequent convictions for violent offenses could subject him to a life sentence under the repeat violent offender statute. Notably, the defendant does not argue that he was unaware at the time he pled guilty to rape in 1987 that this conviction could be used to enhance future convictions in any way. We note that had it occurred, the trial court's failure to advise the defendant that his rape conviction resulting from a guilty plea to rape could be used to enhance future convictions is not an error of constitutional dimension. See Blankenship v. State, 858 S.W.2d 897, 905 (Tenn. 1993) Instead, the defendant claims that he did not know at the time he pled guilty that his 1987 conviction could be used to impose a sentence of life imprisonment under the repeat violent offender statute for some later conviction. While that is undoubtedly true because the repeat violent offender statute was not yet enacted, from the point of the repeat violent offender statute's codification, he was on notice of this possibility. The statute does not violate his due process rights.

## CONCLUSION

Based upon the foregoing reasons and the record as a whole, we hold that the trial court committed harmful error in not allowing the defendant to cross-examine the victim on the prior false accusation of rape. Therefore, we reverse the judgments of conviction and remand the case for a new trial.

_____
JOSEPH M. TIPTON, JUDGE