IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 25, 2007 Session

**STATE OF TENNESSEE v. MILTON LEBRON BYRD**

**Appeal from the Criminal Court for Hamilton County**
**No. 257167      Rebecca Stern, Judge**

_____

**No. E2006-02619-CCA-R3-CD - Filed April 2, 2008**

_____

The defendant, Milton Lebron Byrd, was convicted of attempted first degree premeditated murder, a Class A felony, and aggravated assault, a Class C felony. The trial court merged the offenses and sentenced the defendant to life without the possibility of parole as a repeat violent offender. On appeal, he contends that the evidence is not sufficient to support his conviction and that the repeat violent offenders statute is unconstitutional in violation of the prohibition against cruel and unusual punishment and of his due process and equal protection rights. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Jerry H. Summers and Marya L. Wegenka, Chattanooga, Tennessee (on appeal), and Kelli L. Black, Chattanooga, Tennessee (at trial), for the appellant, Milton Lebron Byrd.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William H. Cox, III, District Attorney General; and Bates W. Bryan, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's stabbing his father's girlfriend, Valnetta Blount. Ms. Blount testified at the trial that on September 13, 2005, she lived with her boyfriend, Ernest Milton Byrd; the defendant, Ernest Byrd's son; and the three children she and Mr. Byrd had together. She said she had been in a relationship with Mr. Byrd for about nineteen years and that they had lived in a house on Third Avenue in Chattanooga for about a month before the stabbing occurred. She said that at 1:30 p.m. on September 13, 2005, she and the defendant were the only people home. She said they talked about $20 that she owed the defendant. She said she told the defendant that she did

not have the money but that she would get it for him. She said she and the defendant were not fighting and that the defendant told her he was not mad at her.

Ms. Blount testified that the defendant's father, Mr. Byrd, came home shortly thereafter and that he and the defendant began arguing. The defendant complained to Mr. Byrd that Ms. Blount owed him $20, and Mr. Byrd offered to give the defendant $15. Ms. Blount said the argument was a continuation of an argument the defendant and Mr. Byrd had a couple of days earlier, during which Mr. Byrd told the defendant to get a job so he could get his own apartment. She said that at one point after Mr. Byrd's arrival at the house on September 13, 2005, Mr. Byrd was sitting on a couch in the living room and she was standing near the front door talking on the telephone when the defendant walked to the kitchen, which was through an open doorway adjacent to the living room. She said that the defendant came out of the kitchen and toward her and that she did not see anything in his hand, as he was holding his hand behind his back. She said that the defendant approached her, told her, "I'll teach you," and stabbed her with a knife. She said that she struggled with the defendant and that Mr. Byrd grabbed the defendant. She said the defendant had stabbed her in the chest and tried to put the knife deeper into her chest. She said she feared she would die if the defendant stabbed her any deeper.

Ms. Blount testified that when Mr. Byrd grabbed the defendant, she ran from the house, looking for someone to help her. She said she ended up on the porch of Cathy McKee, who lived across the street from her. Ms. McKee called an ambulance, and while they waited on Ms. McKee's porch for the ambulance to arrive, the defendant was on the porch across the street shouting that whoever called the police would be "next." She said the defendant also shouted ,"[D]ie, b----, die." Ms. Blount was taken to the hospital, where she had surgery to treat the two stab wounds–one to her chest and one to her arm–caused by the defendant. She identified a photograph of the knife that the defendant used to stab her, which she said came from her kitchen. She also identified photographs of her bloody cellular telephone and of blood stains on the sidewalk in front of her house.

On cross-examination, Ms. Blount testified that she was not employed in September 2005 and was receiving government assistance. She said Mr. Byrd was self-employed and supported her and their children. She said she lived in Kentucky apart from Mr. Byrd for some time and that she had returned about two months before the stabbing. She said Mr. Byrd did not know she received government assistance. She admitted that she was a drug user but denied using crack cocaine the day of the incident. She said that on September 13, 2005, she and the defendant were at home alone from about 10:00 a.m. until Mr. Byrd came home at 1:00 or 1:30. She said they had no problems and did not fight, even though she owed the defendant $20 and the defendant owed her $40. She said the defendant did not threaten to kill her before the stabbing.

Dr. Vincent Mejia testified as an expert medical doctor and surgeon. He was the trauma surgeon who treated Ms. Blount on September 13, 2005. He said Ms. Blount arrived at the hospital with a stab wound in her chest and one in her "right upper extremity." He performed surgery on Ms. Blount and first performed a "pericardial window" and determined that there was no injury to her heart. He said there was a transection, or complete division, of a vessel and a laceration to her lung

and pulmonary artery vessel. This caused a lot of bleeding, and almost one liter of blood had to be drained from Ms. Blount's chest. He described the injury to Ms. Blount's arm as a "complex laceration," about ten centimeters long and deep enough to penetrate the muscle.

On cross-examination, Dr. Mejia testified that he did not ask about the circumstances surrounding Ms. Blount's stabbing wounds when she was brought into the hospital. He identified her medical records and acknowledged that they noted that Ms. Blount was conscious when she arrived at the hospital and reported not having any numbness or weakness. He said a complete drug screen was ordered on Ms. Blount. He said the stab wound to Ms. Blount's chest was about seven centimeters long. He said he could not determine how the wound to the arm occurred and that it was not deep enough to penetrate the bone. Ms. Blount was discharged from the hospital on September 19 and readmitted on September 22 due to a "retained hemothorax," which may have been caused by an infection that may or may not have been caused by bacteria on the knife that penetrated her.

Ernest Milton Byrd testified that he was the defendant's father and that the defendant was living in his home on September 13, 2005. He said that he got home from work on that day at around 2:00 and had been home about ten minutes before the defendant stabbed Ms. Blount. He said that when he arrived home, the defendant and Ms. Blount were talking about the $20 that Ms. Blount owed the defendant. He said that he offered to give the defendant $15 but that the defendant told him to "forget about it." He said he went to the living room to watch television. He said there was no further discussion or disagreement before the defendant went to the kitchen, then walked toward Ms. Blount, said "I'll teach you," and stabbed her. He said he grabbed the defendant's arm while Ms. Blount ran out of the house. He said that the defendant told him, "I'm going to kill her," and that he had to hold the defendant to keep the defendant from chasing after Ms. Blount. He told the defendant to stay inside the house while he went outside to check on Ms. Blount. He found Ms. Blount on Ms. McKee's porch with a towel held against her chest. He saw that Ms. Blount had been stabbed in the chest and was bleeding badly.

On cross-examination, Mr. Byrd testified that he came home at 2:00 because Ms. Blount had requested money from him for gas. He said he and Ms. Blount had been together for eighteen or nineteen years and had lived in the house on Third Avenue for about four or five months before the incident occurred. He denied that he got into a fight with the defendant before the defendant stabbed Ms. Blount. He said he was aware that Ms. Blount used crack cocaine, although he did not approve of it and did not give her money for drugs.

Cathy McKee testified that she lived across the street from Ms. Blount and Mr. Byrd. She said that on September 13, 2005, she was washing dishes in her house when Ms. Blount knocked on her door and asked her to call an ambulance. She said that shortly before that, she had seen Ms. Blount and the defendant talking to each other outside. She said that she called 9-1-1 and that while they waited for an ambulance to arrive, the defendant was outside his house shouting that whoever called an ambulance was "going to be next." She said the defendant also said, "[L]et the b---- die." She acknowledged that she did not see Ms. Blount get stabbed and that she met with Ms. Blount, Mr. Byrd, and the district attorney, at the same time, a few weeks before the trial.

Tommy Fraley testified that he lived next door to Ms. Blount and Mr. Byrd. He said that he was home on September 13, 2005, when he received a telephone call that caused him to go outside. He said he saw Ms. Blount lying on the porch of the house across the street and bleeding. He said the defendant was standing in the front yard of Ms. Blount's and Mr. Byrd's house shouting at them not to "help that b----" and telling them to "let her die." He said the defendant shouted until the police arrived but did not leave the yard.

Chattanooga Police Department Investigator Jeffery Gaines testified that he arrived at Ms. Blount's house on September 13, 2005, at about 2:20 p.m. He said another officer had arrived before him and had the defendant in custody. He said that while he waited for the crime scene unit to arrive, he obtained a list of witnesses and took statements from witnesses who were present. He said he did not enter the house until the crime scene unit arrived about twenty minutes after he got there. He said that officers from the crime scene unit took photographs of the scene and collected evidence but that none of the evidence was tested. He said he did not talk to Ms. Blount until the next day, when she was still in the hospital.

Investigator Gaines testified that he worked in the police department's domestic violence unit. He said that the homicide unit was first called to respond to Ms. Blount's stabbing but that they left in order for the domestic violence unit to handle the investigation. He said he briefly spoke to the defendant while the defendant was in a police car and agreed that the defendant was not combative or argumentative. He identified the shirt that the defendant was wearing when arrested and acknowledged that it did not appear to have blood on it.

The jury found the defendant guilty of the charged offenses. The trial court ultimately merged the two counts and sentenced the defendant under the repeat violent offenders statute.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction for attempted first degree murder. He argues that there is no evidence of premeditation and that, at most, the evidence supports a conviction of attempted second degree murder or attempted voluntary manslaughter. The state counters that the evidence is legally sufficient to prove attempted premeditated murder.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant was charged and convicted of "unlawfully, intentionally and with premeditation attempt[ing] to kill Valnetta Blount" in violation of Tennessee Code Annotated section 39-13-202. That statute defines premeditation as follows:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the attempted killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has noted the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

In the light most favorable to the state, the evidence in the present case shows that the defendant came upon the unarmed victim with a knife and stabbed her. There is conflicting evidence regarding whether the defendant and his father were arguing before the defendant stabbed Ms. Blount. However, Ms. Blount testified that she had been in the house with the defendant all day and had not been fighting or arguing with him. The defendant walked into the kitchen, grabbed a knife, and then approached Ms. Blount while hiding the knife behind his back. The defendant's attack was a shock to both Ms. Blount and Mr. Byrd. The defendant stabbed Ms. Blount in the chest and attempted to stick the knife further into her chest while Ms. Blount struggled, and his father had to grab his arm to pull him off Ms. Blount. Ms. Blount also had a stab wound in her arm, which indicates that the defendant attempted to stab Ms. Blount a second time. The defendant told Ms. Blount, "I'll teach you," immediately before he stabbed her. Ms. Blount had severe internal bleeding that required surgical treatment. The defendant shouted comments after the stabbing that indicated that he did not want anyone to help Ms. Blount and hoped that she would die.

This evidence is sufficient to establish the elements of attempted first degree murder, including premeditation. Particularly relevant to the premeditation element are the facts that the victim was unarmed and that the defendant walked into the kitchen to obtain a knife, held the knife behind him while he approached an unaware Ms. Blount, and told Ms. Blount "I'll teach you" just before stabbing her. Although there was evidence that the defendant may have been arguing with his father before he stabbed Ms. Blount, Ms. Blount testified that she and the defendant were getting along well that day and were not fighting.

In arguing that there is not sufficient evidence of premeditation, the defendant compares his case to two recent cases in which this court held that the evidence was insufficient. In State v. Michael H. Evans, No. M2005-02048-CCA-R3-CD, Humphreys County (Tenn. Crim. App. Sep. 19, 2006), the defendant stabbed and killed the victim after they had been drinking and had begun fighting. This court held that the evidence did not show premeditation because there was no evidence that the defendant "made any declarations of intent to kill the victim, made any preparations to conceal the offense prior to stabbing the victim, or had a previously formed design or intent to kill the victim." Id. slip op. at 7. The court noted that there was no evidence that the defendant procured the knife in his possession for the purpose of killing the victim, as the knife was in the defendant's possession earlier in the evening and the victim had even used the knife at one point, and that the defendant appeared upset after the killing occurred. Id. The court noted that the fact that the victim was unarmed was not alone sufficient evidence of premeditation. Id. This court, in State v. Brandon Compton, No. E2005-01419-CCA-R3-CD, Knox County (Tenn. Crim. App. Oct. 13, 2006), noted similar factors and concluded that there was not sufficient evidence that the defendant killed the victims with premeditation. In that case, the defendant and the victims were involved in a drug deal, and the defendant chased after and shot the victims as they were attempting to leave with his drugs and without paying. The court noted there was no evidence the defendant had procured his weapon for the purpose of killing the victims and that his being armed and attempting to conceal the crime afterwards were not sufficient facts to prove premeditation. Id. slip op. at 6. The court further noted that the defendant's hostility toward the victims was triggered by the victims' attempt to steal a large amount of drugs belonging to the defendant. Id. Thus, the court concluded that the defendant's intent to kill the victims was formed in passion. Id.

The present case can be distinguished from these prior cases in that the evidence shows that the defendant did not obtain the knife he used to kill Ms. Blount until just before he stabbed her. There is also evidence that the defendant concealed the knife while he approached Ms. Blount. While there is evidence that the defendant was upset about money that Ms. Blount owed him, we cannot conclude that the evidence shows that the intent to kill was formed while the defendant was in a state of passion as the defendant in Brandon Compton was. Moreover, while the defendant was not calm after he stabbed Ms. Blount, he also did not appear upset over what he had done but rather expressed hope that Ms. Blount would die from her wounds. We conclude that sufficient evidence exists by which a jury could infer that the defendant formed the intent to kill Ms. Blount prior to his stabbing her and that he committed the act with premeditation.

## II. CONSTITUTIONALITY OF REPEAT VIOLENT OFFENDERS STATUTE

The defendant challenges the constitutionality of Tennessee Code Annotated section 40-35-120, the repeat violent offenders statute. The record shows that the defendant was convicted of second degree murder in 1992, which, after his current attempted first degree murder conviction, qualified him as a "repeat violent offender" under section 40-35-120(a)(3)-(4). Under the statute, the trial court ordered the mandatory sentence of life without the possibility of parole. The defendant contends the act provides unconstitutionally cruel and unusual punishment and violates his constitutional rights to due process and equal protection of the law.

-6-

## A. Cruel and Unusual Punishment

The defendant contends that the repeat violent offenders statute is cruel and unusual punishment, in violation of both the federal and state constitutions. See U.S. Const. amend. VIII; Tenn. Const. art. I, § 16. We note that the Eighth Amendment gives large discretion to the punishing jurisdiction to determine appropriate sentencing schemes. Rummel v. Estelle, 445 U.S. 263, 100 S. Ct. 1133, 1145, 63 L. Ed. 2d 382 (1980). In this regard, our legislature is entitled to "distinguish among the ills of society which require a criminal sanction, and may punish them appropriately without violating constitutional limitations." State v. Hinsley, 627 S.W.2d 351, 355 (Tenn. 1982). In determining whether a punishment is cruel and unusual, we consider (1) whether the punishment conforms to contemporary standards of decency, (2) whether it is grossly disproportionate to the offense, and (3) whether it goes beyond that necessary to achieve a legitimate penal objective. State v. Black, 815 S.W.2d 166, 189 (Tenn. 1991).

In addressing the defendant's contention, we will review the three factors outlined in Black, while also considering that "we are required to indulge every presumption and resolve every doubt in favor of the constitutionality of the statute." In re Burson, 909 S.W.2d 768, 775 (Tenn. 1995). First, regarding whether the defendant's sentence comports with contemporary standards of decency, the defendant argues that it does not because our Sentencing Reform Act generally allows for judicial discretion and the consideration of relevant mitigating factors in setting sentences, whereas the repeat violent offenders statute requires a mandatory sentence. As the defendant points out, our supreme court has noted that the "'clearest most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.'" Van Tran v. State, 66 S.W.3d 790, 800 (Tenn. 2001) (quoting Penry v. Lynaugh, 492 U.S. 302, 331, 109 S. Ct. 2934, 2953 (1989)). What the defendant does not acknowledge, however, is that many states have laws "providing for enhanced sentencing of repeat offenders" and that "[r]ecidivism has long been recognized as a legitimate basis for increased punishment." Ewing v. California, 538 U.S. 11, 24-25, 123 S. Ct. 1179, 1187-88 (2003). Furthermore, our legislature has stated that the Sentencing Reform Act is premised in part on meting out punishment in relation to the seriousness of offenses committed and the criminal histories of offenders. See T.C.A. § 40-35-102. In addition, the defendant has not argued or demonstrated that the majority of the public regards the sentence of life without the possibility of parole as an unacceptable punishment for defendants with multiple violent felony convictions. Cf. Black, 815 S.W.2d at 189 ("In determining whether the death penalty conforms with contemporary standards of decency, we note that there is nothing to indicate that the majority of contemporary Tennesseans consider the death penalty per se an inappropriate punishment for first degree murder.") In establishing a mandatory, severe punishment for defendants convicted of multiple violent felonies, the statute does not conflict with contemporary standards of decency.

Turning to the second factor, we conclude that the sentence of life imprisonment without the possibility of parole is not grossly disproportionate to the offense. We note that federal courts have stated that "only an extreme disparity between crime and sentence offends the Eighth Amendment." United States v. Marks, 209 F.3d 577, 583 (6th Cir. 2000). We further note that the United States Supreme Court has upheld a mandatory sentence of life without the possibility of parole in a case

involving a first-time felony conviction for possession of more than 650 grams of cocaine. Harmelin v. Michigan, 501 U.S. 957, 994, 111 S. Ct. 2680, 2701 (1991); cf. Solem v. Helm, 463 U.S. 277, 296-97, 103 S. Ct. 3001, 3013 (1983) (holding unconstitutional sentence of life without the possibility of parole for recidivist defendant's conviction of uttering a no account check, which did not involve violence or threat of violence, when prior offenses were all "relatively minor.") Our supreme court has held that

> the proper means by which to evaluate a defendant's proportionality challenge under the Tennessee Constitution is that set forth by Justice Kennedy in Harmelin . . . (Kennedy, J., concurring in part). Under this methodology, the sentence imposed is initially compared with the crime committed. Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends–the sentence is constitutional. In those rare cases where this inference does arise, the analysis proceeds by comparing (1) the sentences imposed on other criminals in the same jurisdiction, and (2) the sentences imposed for commission of the same crime in other jurisdictions.

State v. Harris, 844 S.W.2d 601, 603 (Tenn. 1992). Although the defendant's sentence is second only to the death penalty for sentence severity in our criminal justice system, we cannot conclude that it is grossly disproportionate when compared to his violent felony offense, attempted first degree premeditated murder. We are also unpersuaded by the defendant's argument that his sentence is disproportionate because his punishment for criminal attempt under the repeat violent offenders statute is the same sentence he could have received if he had actually completed the offense of first degree murder. As the state points out, the defendant could have faced a possible sentence of death if he had completed the crime. In sum, the defendant's sentence is not grossly disproportionate.

Finally, the defendant's sentence under the repeat violent offenders statute does not go beyond what is necessary to achieve a legitimate penal objective. This court has previously stated the purpose and principles of our sentencing statutes:

> The purpose of the sentencing statutes is to promote justice. Tenn. Code Ann. § 40-35-102. Among the sentencing principles designed to promote that purpose are the principles of preventing crime and promoting respect for the law by providing a deterrent to those likely to violate the law and incarcerating defendants who commit the most serious offenses. Tenn. Code. Ann. § 40-34-12(3)(A), (5). Furthermore, the legislature has a legitimate interest in protecting citizens from crime as a part of the state's police power.

State v. Wyrick, 62 S.W.3d 751, 792 (Tenn. Crim. App. 2001). The defendant's only complaint with regards to his sentence not meeting these penal objectives is that the repeat violent offenders statute cannot be an effective deterrent and achieve penal goals unless potential offenders are aware of the

statute, which is not required. However, as the <u>Wyrick</u> court noted in rejecting an ex post facto challenge to the statute, a person who has committed one of the violent offenses specified in the statute is "presumed to be on notice that any subsequent convictions for violent offenses could subject him to a life sentence under the repeat violent offenders statute." <u>Id.</u> at 794. The effectiveness of the statute in accomplishing penal objectives does not depend on prior actual notice of the consequences one might face under the statute. The defendant has provided no evidence that the statute goes beyond what is necessary to achieve the objectives of promoting justice, preventing and deterring crime, and protecting citizens. The statute does not violate constitutional provisions against cruel and unusual punishment.

## B. Due Process and Equal Protections

The defendant also contends that his sentence under the repeat violent offenders statute violates his constitutional rights to due process and equal protection of the law. <u>See</u> U.S. Const. amend. XIV; Tenn. Const. art. I, § 8; Tenn. Const. art. XI, § 8. The defendant acknowledges that this court has previously rejected similar constitutional challenges to the repeat violent offenders statute. <u>See</u> <u>Wyrick</u>, 62 S.W.3d 751; <u>State v. Bobby Joe Gentry</u>, No. E2003-01069-CCA-R3-CD, Knox County (Tenn. Crim. App. May 6, 2004). However, he asserts that he raises new issues related to the statute's constitutionality under the due process and equal protection clauses that were not discussed in <u>Wyrick</u> and <u>Bobby Joe Gentry</u>.

The defendant argues that his due process rights were violated because he "did not receive prior notice that a conviction for a subsequent violent offense would result in a life sentence without the possibility of parole." The defendant complains that his first violent felony conviction for second degree murder occurred in 1992, before the repeat violent offenders act took effect. In rejecting this same argument in <u>Wyrick</u>, this court explained:

> Penalty "enhancing statutes only enhance the sentence for the triggering offense, rather than punish prior acts." <u>State v. Johnson</u>, 970 S.W.2d 500, 505 (Tenn. Crim. App. 1996) (holding that the multiple rapist statute does not operate to increase punishment for a prior offense ex post facto but instead only enhances the punishment for the triggering offense). Although the repeat violent offender statute looks to prior violent offenses–here the 1987 rape conviction–to determine whether a defendant qualifies as a repeat violent offender, it is the triggering offense–here the two aggravated rape convictions–for which the life sentence is imposed. <u>See</u> Tenn. Code. Ann. § 40-35-120(g) (providing that the "court shall sentence a defendant who has been convicted of any offense listed in subdivision (b)(1), (c)(1), or (d)(1) to imprisonment for life without possibility of parole if the court finds beyond a reasonable doubt that the defendant is a repeat violent offender as defined in subsection (a)"). In other words, the statute disadvantages the defendant in

-9-

relation to his present offenses rather than his 1987 conviction. Because the repeat violent offender statute was in effect before the defendant committed the present offenses, no ex post facto problem arises.

The same reasoning applies to the defendant's due process argument. The defendant summarily contends that the repeat violent offender act violates his right to due process because he did not know at the time he pled guilty to rape in 1987 that this conviction could later be used to qualify him for repeat violent offender status. The portions of the repeat violent offender statute that apply to the defendant became effective on July 1, 1995. At that point, the defendant was presumed to be on notice that any subsequent convictions for violent offenses could subject him to a life sentence under the repeat violent offender statute. . . . The statute does not violate his due process rights.

Wyrick, 62 S.W.3d at 793-94. The defendant in the present case does not present any new argument which leads us to a different conclusion, although he also points out that the law is known and captioned as the "Three strikes" law, while he was convicted after only "two strikes." However, the Wyrick court also addressed this issue and concluded that it did not affect the validity of the law. Id. at 790. The defendant's sentence does not violate his due process rights.

Regarding his equal protection claim, the defendant argues that the statute "does not extend the notice requirement for enhanced punishment for subsequent offenses to all repeat defendants." The defendant compares the statute to the enhancement of punishment for subsequent driving under the influence (DUI) convictions under Tennessee Code Annotated section 55-10-403(g)(1), which requires that "[a]ny person convicted of an initial or subsequent offense shall be advised, in writing, of the penalty for second and subsequent convictions."

In Wyrick, this court held that the repeat violent offenders statute does not violate equal protection provisions because it treats different classes of defendants differently. The court concluded that a rational basis existed for this different treatment. The court reasoned:

Equal protection of the law requires that the state treat persons under like circumstances and conditions the same. Genesco, Inc. v. Woods, 578 S.W.2d 639, 641 (Tenn. 1979), superseded on other grounds by Combustion Eng'g, Inc. v. Jackson, 705 S.W.2d 655 (Tenn. 1986). . . . "[R]ecidivist statutes do not violate either the equal protection or the due process provisions of the State and Federal Constitutions." State v. Yarbro, 618 S.W.2d 521, 525 (Tenn. Crim. App. 1981) (evaluating enhanced punishment for a second offense of possession of a controlled substance); see also Glasscock v. State,

-10-

570 S.W.2d 354, 355 (Tenn. Crim. App. 1978) (observing that the law is well-settled that the Habitual Criminal Statute does not violate equal protection or due process); Moore v. State, 563 S.W.2d 215, 218 (Tenn. Crim. App. 1977) (holding that the enhancement of the defendant's "present punishment . . . because of his status as an habitual criminal violates no constitutional provision, State or Federal"). In State v. Taylor, this court held that the Class X Felonies Act of 1979 did not violate equal protection because the Act treated all defendants under like circumstances and conditions alike. 628 S.W.2d 42, 47 (Tenn. Crim. App. 1981). The Class X Felonies Act listed eleven felonies that were dangerous to human life and provided that these felonies were "determinate in nature, not subject to reduction for good, honor or incentive or other sentence credit of any sort, . . . terminate only after service of the entire sentence, and shall not be subject to pretrial diversion." Id. (citing Tenn. Code Ann. § 39-5403 (repealed 1989)). Similarly, the repeat violent offender statute treats defendants who have committed either two or three of certain specified violent offenses alike in that it imposes a sentence of life without parole for all qualifying defendants. See Tenn. Code Ann. § 40-35-120(g). Repeat violent offenders are under different circumstances than defendants who have not committed at least two violent offenses. Therefore, the equal protection of the law does not require that these two categories of offenders be treated alike.

Wyrick, 62 S.W.3d at 792. After discussing the purpose and principles of our sentencing laws, the Wyrick court further concluded that "[t]he legislature's decision to impose the very severe sentence of life imprisonment without possibility of parole upon those criminals who repeatedly commit violent offenses is rationally related to its desire to protect the public and deter crime." Id. See also Bobby Joe Gentry, slip op. at 26-27 (holding that repeat violent offenders statute does not violate defendant's equal protections rights because "other statutes require that a jury determine whether a previous offense was committed and the violent offender statute mandates that the trial court make this determination" or because the statute "treats some violent offenders differently than other violent offenders"). In our view, part of the legislature's decision to impose a severe penalty on defendants who repeatedly commit specifically enumerated violent offenses is its decision not to require more notice to such felons than is required under the constitution. Its different treatment of DUI offenders does not violate equal protection provisions. This issue is without merit.

**CONCLUSION**

Based on the foregoing and the record as a whole, we conclude that the evidence is sufficient to support the defendant's conviction of attempt to commit first degree premeditated murder. We

-11-

also conclude that the defendant's sentence under the repeat violent offenders statute is not unconstitutional. The judgment of the trial court is affirmed.

_____

JOSEPH M. TIPTON, PRESIDING JUDGE
